**Harry HUGE et al., Plaintiffs,**

**v.**

**Norman C. REID et al., Defendants.**

**Civ. A. No. 77–M–0469.**

United States District Court,
N. D. Alabama,
Jasper Division.

March 15, 1979.

Henry S. Ruth, Jr., and Walter P. O'Connell, UMW Health & Retirement Funds, Washington, D.C., William E. Mitch and Earl V. Brown, Cooper, Mitch & Crawford, Birmingham, Ala., for plaintiffs.

James E. Clark, London, Yancey, Clark & Allen, Birmingham, Ala., for defendants.

MEMORANDUM OPINION IN LIEU OF
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

McFADDEN, Chief Judge.

This is an action for collection of contributions allegedly due from an employer to

the trustees of an employee pension and benefit plan pursuant to a collective bargaining agreement. The collective bargaining agreement is the National Bituminous Coal Wage Agreement ("NBCWA"), the employer is Poe Coal Company, a partnership of Norman C. Reid and A. V. Keller ("Poe"), and the pension and benefit plan is the United Mine Workers of America Health and Retirement Funds ("the Funds"). Accordingly, jurisdiction over this action exists under § 502 of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 and § 301 of the National Labor Relations Act, as amended, 29 U.S.C. § 185.

The Funds' Trustees seek contributions ("royalties") due under Article XX of the 1974 NBCWA, which provides that a signatory coal operator, such as Poe, pay to the Funds a specified rate for each ton of coal mined or acquired for use or sale and for each hour of work performed by collective bargaining unit members. It is undisputed at this stage of the litigation that Poe signed the 1974 NBCWA, that Poe mined coal, and that its union employees worked in mining coal. Thus, for the period covered by this action—January 1, 1974 to May 18, 1976—Poe concededly owes the Funds for hours and tonnage.[1]

After an audit of Poe's books and records conducted by a Certified Public Accountant, the Trustees filed their Motion for Summary Judgment in the amount of $243,083.20, the amount of the principal indebtedness, on August 25, 1977.[2] This figure was supported by the affidavit of the C.P.A., Leldon Amick. Amick's work papers, and testimony relating to the audit are also in the record by virtue of a deposition of Amick taken by Poe. *See, Webster v. Offshore Food Services, Inc.,* 434 F.2d 1191, *cert. den.*

404 U.S. 823, 92 S.Ct. 44, 30 L.Ed.2d 50 (1971).

Amick's affidavit establishes that he was employed by the Funds to conduct audits of signatory companies, and had examined the business records of Poe as to tonnage of coal produced, acquired or procured for the period December 1, 1973 through May 18, 1976, and for hours worked for the period December 6, 1974 through May 18, 1976.[3]

Amick's affidavit fixes the debt as follows:

"The records inspected revealed that defendant Poe Coal Company failed to report to the plaintiff Trustees of the United Mine Workers of America Health and Retirement Funds for the periods of audit 135,749 tons of produced coal and similarily [sic] failed to report 49,761 tons of purchased or acquired non-signatory coal, resulting in an indebtedness of $162,-490.20 to United Mine Workers of America Health and Retirement Funds on account of underreported tonnage. Further, the records disclosed that Poe Coal Company had also failed to report for the periods of audit to plaintiffs 80,277 classified hours of work, resulting in an indebtedness of $80,593.00 to United Mine Workers of America Health and Retirement Funds for said hours. Accordingly, defendant became indebted to the United Mine Workers of America Health and Retirement Funds in the amount of $243,-083.20 based upon the Trust Agreement as contained in the National Bituminous Coal Wage Agreement executed between the defendant and the United Mine Workers of America.

---

1. The Funds assert no debt for 1973, although Poe was signatory for that period. Poe ceased business on May 18, 1976.

2. This figure was increased by interest and award of fees and costs to $277,609.20.

3. Contributions or royalties for hours were first contractually required on December 6, 1974.

The breakdown of the above indebtedness, including time-periods, royalty rates, and payments made by defendant is as follows:

January 1 through May 11, 1973

| | | |
|---|---|---|
| 96,965 tons due at .65 | $63,027.25 | |
| Less payments | 63,830.65 | [$ 803.40] |

May 12, 1973 through November 11, 1973

| | | |
|---|---|---|
| 124,978 tons due at .70 | 87,490.90 | |
| Less payments | 86,368.80 | $ 1,122.10 |

November 12, 1973 through December 31, 1973

| | | |
|---|---|---|
| 25,466 tons due at .75 | 19,099.50 | |
| Less payments | 21,633.00 | [$ 2,533.50] |

January 1, through May 11, 1974

| | | |
|---|---|---|
| 103,885 tons due at .75 | 77,913.75 | |
| Less payments | 49,872.00 | $ 28,041.75 |

May 12 through November 11, 1974

| | | |
|---|---|---|
| 185,190 tons due at .80 | 148,152.00 | |
| Less payments | 112,749.60 | $ 35,402.40 |

December 6, 1974 through December 5, 1975

| | | |
|---|---|---|
| 242,086 tons due at .74 | 179,143.64 | |
| 49,761.35 tons procured or acquired due at $1,182 | 58,817.92 | |
| 154,464.75 hours due at .90 | 139,018.28 | |
| | 376,979.84 | |
| Less Payments | 221,918.38 | $ 155,061.46 |

December 6, 1975 through May 18, 1976

| | | |
|---|---|---|
| 98,550 tons due at .78 | 76,869.00 | |
| 49,737.50 hours due at $1.40 | 69,632.50 | |
| | 146,501.50 | |
| Less Payments | 119,708.91 | $ 26,792.59 |
| Rounding Differences | | $ 243,083.40 |
| | | [.20] |
| Total Amount Due | | $ 243,083.20 [4] |

---

The Amick audit work papers set forth his methodology. To establish the tonnage debt, he reviewed third party documents in the files of Poe such as customer receiving reports,[5] together with Poe's own sales invoices. Amick subtracted from the total tonnage reflected by those records all tonnage purchased or acquired from signatory companies. Under Article XX of the 1974 National Bituminous Coal Wage Agreement royalties are due on coal acquired or procured, as well as coal produced. Amick, as

---

4. The remainder due comprises, as noted above, interest and ERISA -awardable attorneys' fees.

5. Poe's principal customers were few—Alabama Power Company, U. S. Steel and the Alabama Department of Mental Health.

a matter of caution, assumed that royalties to the Funds were paid on coal acquired from signatory companies by those companies, that is, by the operators who signed the NBCWA and thus had a duty to pay operators who signed the NBCWA and thus had a duty to pay royalties on their coal. Accordingly, by resort to conservative assumptions, assumptions favorable to Poe, no debt was fixed by Amick for such coal.

The accountant then compared that final figure with tonnage already reported to the Funds and for which contributions had been made, the difference establishing the remaining tonnage debt. In a later deposition John Shoemaker, Poe's bookkeeper and office manager, confirmed the Amick findings as to the extent of purchased signatory coal and, by necessary implication, the amount of credit for purchased signatory coal.

In establishing a debt for hours, Amick reviewed Poe's daily time cards, foreman's daily time sheets and other Poe wage records such as payroll computer print-outs. Credits were allowed where these records indicated contractual pay for all compensable non-work items such as birthdays, holidays and sickdays.

To traverse this audit, Poe filed the affidavit of John Shoemaker, which, in substance, stated no more than that Amick had reached a *wrong result*. No facts were adduced to support this bare conclusion. Because this opposing affidavit was ". . . conclusory and fail[ed] to specifically controvert any of the material facts set forth . . ." in plaintiffs' moving papers or the Amick audit, this Court on December 27, 1977 entered summary judgment for Plaintiffs. (Findings of Fact and Conclusions of Law dated December 27, 1977.)

Poe then moved for reconsideration. The Court granted defendant's motion on September 12, 1978, principally upon the basis of assertions made in a further affidavit by Shoemaker filed in support of Poe's motion. Plaintiffs commenced discovery directed at those assertions; interrogatories and requests to produce were filed to uncover the documentary support for the reductions in the debt claimed by Poe in its motion for reconsideration and supporting papers. No responses of any kind were ever filed by Poe. Shoemaker, however, was deposed. He testified that he had never seen the Amick audit before February 20, 1979, although his prior affidavit, purportedly based upon a review of that audit, was dated January 6, 1978.

Plaintiffs filed a motion seeking (i) reinstatement of their motion for summary judgment, (ii) or alternatively, imposition of Rule 37(d) sanctions upon Poe for Poe's failure to respond to their discovery requests and (iii) issuance of injunctive relief to prevent disposal of the assets of Reid, Poe's principal partner, *pendente lite.* At a hearing on these applications, the Court reinstated the summary judgment and directed Poe to produce documentary or other evidence to traverse the specific factual averments of the Amick affidavit, if renewal of the summary judgment were to be avoided. The issue of other relief was held in abeyance pending the resolution of plaintiffs' reinstated summary judgment motion.

In spite of the Court's direction, no responses were forthcoming, beyond an effort to rehabilitate Shoemaker, and a statement promising that a future audit, to be taken at Poe's behest, would controvert the Amick audit. This litigation thus rests in this posture. The deposition of John Shoemaker, wherein he states that he never reviewed the Amick audit, effectively retracts the basis for Defendants' motion for reconsideration which this Court had granted. Poe has engaged in frustration of the discovery procedures mandated by the Federal Rules of Civil Procedure. Moreover, no records or specific factual averments have been submitted to the Court following the reinstatement of Plaintiffs' motion for summary judgment, and this Court's direction that Poe specifically and factually controvert the Amick audit.

The Amick affidavit, specifically setting forth a debt, is opposed only by the promise of factual controversion. This lack of spe-

cific factual controversy is substantially admitted by Poe's final argument that summary judgment should never be based upon an accountants' audit. But:

"... [i]t is not the office of Rule 56 to preserve purely speculative issues of fact for trial." *Atlantic States Construction Co. v. Robert E. Lee and Company, Inc.*, 406 F.2d 827, 829 (C.A. 4 1969)

Indeed, this case presents a problem similar to that addressed in *U. S. v. Immordino*, 534 F.2d 1378, 1383 (C.A. 10 1976). There, the Court states:

"... that summary judgment concerning the accounting was properly awarded. An accounting problem has been held especially suited to disposition by summary judgment ... Appellants had had discovery of the files in appellee's possession; yet, they submitted nothing to substantiate their claims of improper crediting of collateral or other discrepancies in the accounting provided by via the affidavits and exhibits."

■ Here, of course, the problem is even more pronounced. Poe has not controverted the Amick audit with any documentary or other evidence from its own records. Rather, Defendant has withheld those records from Plaintiffs and the Court. Plaintiffs, however, have submitted a detailed affidavit. In the face of this affidavit, Defendant cannot all the while withhold evidence with the promise of future production and joining of factual issues. For, summary judgment, in a case such as this where the contractual obligation is admitted and only the extent of the debt is at issue, is proper once:

the moving party sets out a detailed statement. of account and the opposing party fails to adduce specific, legally cognizable items of debit or credit not included in the movant's statement, demonstrating that the amount claimed is inaccurate.

*Golden Oil, Inc. v. Exxon Co.*, 543 F.2d 548, 551 (5th Cir. 1976).

Accordingly, judgment will issue in favor of plaintiffs in the amount of $297,181.10, such sum including interest at six percent from December 27, 1977.

■ Under 29 U.S.C. § 1132(g), the Funds are entitled to a reasonable attorneys' fee and costs. Based on the affidavit of Earl V. Brown, the amount of attorneys' fees and costs is $2,636.41, and that amount is reasonable.