**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Plaintiff,**

v.

**ALCO EXPRESS COMPANY, Defendant.**

Civ. No. 77–70031.

United States District Court,
E. D. Michigan, S. D.

Aug. 26, 1981.

Russell N. Luplow, P. C., Russell N. Luplow, and Diana L. S. Peters, Bloomfield Hills, Mich., for plaintiff; Charles J. Taunt, Bloomfield Hills, Mich., and Robert J. Lenihan, II, Birmingham, Mich., of counsel.

Joseph J. Fabrizio, Fabrizio & Miller, P. C., Bloomfield Hills, Mich., for defendant; Richard M. Lustig, Lustig & Friedman, P. C., Southfield, Mich., of counsel.

## OPINION

COHN, District Judge.

### I.

Before the Court is a petition by plaintiff Central States, Southeast and Southwest Areas Pension Fund (Central States) for attorney fees and double interest as "mandated" by Section 306 of the Multiemployer Pension Plan Amendments Act of 1980, Pub.L. 96–364, 94 Stat. 1208, signed into law by President Carter and effective September 26, 1980 (1980 amendments).

### 1.

On January 20, 1981 the Court ordered a summary judgment[1] in favor of Central States declaring defendant Alco Express Company (Alco) contractually obligated to make pension plan contributions on behalf of its employees to Central States for the

---

[1] See the Court's Opinion and Order on Cross-Motions for Summary Judgment of January 21, 1981.

period April 1, 1976 to March 31, 1978. A judgment in the amount of $126,672.32 was entered on April 6, 1981. An order denying a motion to clarify or amend the judgment was entered May 6, 1981 and a stay of enforcement of the judgment was denied on May 5, 1981.

In its complaint, filed January 5, 1977, Central States alleged that since October 1975 Alco had "failed, neglected, omitted and/or refused to tender its required contributions in a timely fashion and through November, 1976, [and] owes ... the sum of Twenty-Three Thousand Four Hundred Fourteen and 74/100 ($23,414.74) Dollars in delinquent contributions and interest." Thereafter Central States' claims were extended to include delinquent contributions through January 31, 1981. With the exception of the period from April 1, 1976 to March 31, 1978 there was no real dispute as to the amounts owed by Alco to Central States or that Alco was delinquent in making payment.

The order of January 20, 1981 resolved a dispute over whether the contractual obligation of Alco to make pension plan contributions on behalf of its employees to Central States terminated on March 31, 1976 or continued to March 31, 1978. The Court held that neither notice of a desire to modify the collective bargaining agreement between the parties nor a strike terminated the agreement or affected the obligation of Alco to make payments. There was nothing in the presentations to the Court to suggest that either party to the dispute was in bad faith in the position it maintained.

The judgment of April 6, 1981 represented amounts due for the periods April 1, 1975 to March 31, 1978 ($56,348.62) and April 1, 1978 to January 31, 1981 ($70,323.70) inclusive of interest. The amounts due for the period April 1, 1976 to March 31, 1978 were not separately stated.

**2.** The 1980 amendments in general require the Court to award interest on unpaid contributions and an amount equal to interest on the unpaid contributions, hence the term "double interest".

2.

The 1980 amendments became effective during the pendency of this case. Central States takes the position the Court is obligated to award attorney fees and double interest[2] as liquidated damages as provided in Section 306; Alco takes the position that Section 306 is prospective only and therefore the Court has discretion in awarding attorney fees and there is no right to double interest. Alco also challenges the amount of attorney fees claimed by Central States.

Applying the general principle that a court is to apply the law in effect at the time it renders its decision unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary, *Bradley v. School Board of the City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), the Court finds it is obligated to award attorney fees and statutory liquidated damages in an amount equal to the amount of interest accrued on the delinquent contributions. Also, following the principles of *Northcross v. Board of Education of the Memphis City Schools*, 611 F.2d 624, 636–43 (6th Cir. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980), it determines the reasonable attorney fees due Central States to be $20,625.00.

II.

The Employee Retirement Income Security Act of 1974, Pub.L. 93–406, 88 Stat. 829 (codified at 29 U.S.C. § 1001 *et seq.*) (ERISA), which become effective on September 2, 1974, imposed a comprehensive regulatory scheme on employee benefit plans. One of its important goals was the protection of the interests of participants in such plans by providing "... appropriate remedies, sanctions, and ready access to the Federal courts". 29 U.S.C. § 1001(b).

In particular, Section 502 of ERISA,[3] 29 U.S.C. § 1132, provided in part:

**3.** Section 502 is part of Title I (Protection of Employee Benefit Rights), Subtitle B (Regulatory Provisions), Part 5 (Administration and Enforcement) of ERISA.

"Sec. 502(a) A civil action may be brought—

.    .    .    .    .

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan;

.    .    .    .    .

(g) In any action under this title by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."

The 1980 amendments were prompted by a number of Congressional concerns, including the need "to alleviate certain problems which tend to discourage the maintenance ...." of such plans. 29 U.S.C. § 1001a(c).

To that end, Section 306[4] of the 1980 amendments provides in part:

"(a) Part 5 of subtitle B of title I is amended by adding after section 514 the following new section:

'DELINQUENT CONTRIBUTIONS

'Sec. 515. Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of the collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.'

(b) Section 502 is amended by—

(2) redesignating subsection (g) as paragraph (1) of such subsection and inserting '(other than an action described in paragraph (2))' between 'title' and 'by' in such redesignated paragraph (1), and adding at the end thereof the following new paragraph: '(2) In any action under this title by a fiduciary for or on behalf of a plan to enforce section 515 in which a judgment in favor of the plan is awarded, the court shall award the plan—

'(A) the unpaid contributions,

'(B) interest on the unpaid contributions,

'(C) an amount equal to the greater of—

'(i) interest on the unpaid contributions, or

'(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

'(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

'(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, the rate prescribed under section 6621 of the Internal Revenue Code of 1954."

Under ERISA delinquent contributions were enforced by an action founded either on state law, the collective bargaining agreement between the parties or the trust agreement forming the foundation for the employee benefit plan. By adding Section 515 to ERISA the 1980 amendments created a statutory cause of action.

Under ERISA the award of attorney fees was discretionary with the Court and an award of interest as liquidated damages was dependent on the terms of the collective bargaining or trust agreement. See *Central States Southeast and Southwest Areas Pension Fund v. Hitchings Trucking, Inc.*, 492 F.Supp. 906 (E.D.Mich.1980). While the Court's discretion to award attorney fees in other kinds of actions continues, under the 1980 amendment to Section 502

---

4. Section 306 is part of Title III (Amendments to Title I of the Employee Retirement Income Security Act of 1974) of the 1980 amendments.

of ERISA a judgment in favor of a plan for delinquent contributions must include (i) interest on the unpaid contributions, (ii) an amount equal to the greater of interest on the unpaid contributions or the liquidated damages provided for under the plan subject to certain limitations, and (iii) attorney fees.

The effect of the 1980 amendments is to substantially increase the cost of failing to make required contributions.

### III.

Central States' claim that Section 306 applies to cases pending at the time it became effective is based on the proposition that in enacting the 1980 amendments Congress sought to remedy problems of great national concern; that Section 306 is remedial in nature and a remedial law is to be applied to pending litigation; and that Section 306 neither deprives Alco of a vested right nor imposes an unanticipated burden. In short, Central States argues that in view of the findings, policies and purposes of the 1980 amendments, the parties to this dispute and the nature of the right and obligations involved, application of Section 306 will not cause "manifest injustice" as that term has been defined by the Supreme Court.

Alco argues that Section 306 should not be applied to this action because to do so would impose an unanticipated substantive obligation on it, particularly since the only matter pending "at or about" September 26, 1980 "was the Court's decision".[5] Alco further argues that this case is a simple collection suit between two parties and the relief now requested goes beyond the terms of the parties' agreement, making it "manifestly unjust" to award Central States additional interest as liquidated damages.

### IV.

### 1.

The Court starts with the proposition that there is nothing in the United States Constitution prohibiting a retroactive law. *Fisch v. General Motors Corporation*, 169 F.2d 266 (6th Cir. 1948).

*Fisch* involved the constitutionality of the Portal-to-Portal Act of 1947, 29 U.S.C. § 251 *et seq.*, which amended the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.*, to deny federal court jurisdiction over actions brought to recover unpaid wages for "walking time" and other activities preliminary to actual work. In *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), the Supreme Court had interpreted the overtime work provisions of the Fair Labor Standards Act to include such time, resulting in a multitude of suits to recover unpaid wages.

Plaintiffs in *Fisch* brought suit before the effective date of the Portal-to-Portal Act, after which defendants successfully moved to dismiss the action for lack of jurisdiction. Quoting Justice Cooley in response to plaintiffs' claim that they were being denied a "vested right", the Court of Appeals said:

> " 'And it may be well at this point to examine in the light of the reported cases the question, What is a vested right in the constitutional sense? and when we have solved that question, we may be the better able to judge under what circumstances one may be justified in resisting a change in the general laws of the State affecting his interests, and how far special legislation may control his rights without coming under legal condemnation. In organized society every man holds all he possesses, and looks forward to all he hopes for, through the aid and under the protection of the laws; "but as changes of circumstances and of public opinion as well as other reasons affecting the public policy, are all the while calling for changes in the laws, and as these changes must influence more or less the value and stability of private possessions,

---

**5.** Alco is clearly incorrect in this contention. The Stipulation of Facts on which the cross-motions for summary judgment were based was filed December 16, 1980; the Order for Submission of Case on Stipulated Facts and Cross-motions for Summary Judgment was entered November 7, 1980.

and strengthen or destroy wellfounded hopes, and as the power to make very many of them could not be disputed without denying the right of the political community to prosper and advance, it is obvious that many rights, privileges, and exemptions which usually pertain to ownership under a particular state of the law, and many reasonable expectations, cannot be regarded as vested rights in any legal sense." * * * ' Cooley's Constitut. Lim., Vol. II, pp. 746–7."

169 F.2d at 270. The court then noted:

"It is urged that the Portal-to-Portal Act is retroactive and applies to plaintiffs' causes of action. This in some respects is undoubtedly true but retroactive laws are not prohibited by the Constitution in civil cases. We have no power to declare them void upon that ground alone. The Congress made its own 'Findings and Policy' and drew therefrom the conclusion that the Act as interpreted by the Mount Clemens decision was seriously interfering with interstate commerce,—that the operation of the Act had placed a burden upon commerce and was an obstruction to the free flow of goods in the stream of commerce; and that it was necessary in the protection of commerce and in the public interest and general welfare and essential to national defense that the Act be passed. We find nothing in the Constitution that challenges the retrospective features of the Act."

169 F.2d at 271–72 (citations omitted).

In *Bradley v. School Board of The City of Richmond, supra*, the Supreme Court held that Section 718 of the Emergency School Act, 20 U.S.C. § 1617,[6] which granted the federal courts authority to award a reasonable attorney's fee when appropriate in school desegregation cases, was applicable to school desegregation cases pending at its effective date.

The Supreme Court "anchored" its conclusion on the above-noted principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary. It stated:

"Where Congress has expressly provided, or the legislative history has indicated, that legislation was to be given only prospective effect, the courts, in the absence of any attendant constitutional problems, generally have followed that lead."

416 U.S. at 715 n. 21, 94 S.Ct. at 2018 n. 21.

In determining whether manifest injustice might result from retrospective application, *Bradley* directs focus upon:

"(a) the nature and identity of the parties;

(b) the nature of their rights; and

(c) the nature of the impact of the change in law upon those rights."

416 U.S. at 717, 94 S.Ct. at 2019. The nature and identity of the parties indicates whether the Court is simply dealing with the private rights of individuals or matters of "great national concern". 416 U.S. at 719, 94 S.Ct. at 2020. As to the second and third criteria, the Supreme Court said:

"The second aspect of the Court's concern that injustice may arise from retrospective application of a change in law relates to the nature of the rights effected by the change. The Court has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional.

.   .   .   .   .

The third concern has to do with the nature of the impact of the change in law upon existing rights, or, to state it another way, stems from the possibility that new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard."

416 U.S. at 720, 94 S.Ct. at 2020–21.

2.

Thus the Court's analysis must focus first on the language of the 1980 amendments,

6. Section 718 was added to Title VII by the Educational Amendments of 1972, Pub.L. 92–318, 86 Stat. 235.

then on its legislative history, and only if no answer appears there must it determine whether manifest injustice would result from applying Section 306 to the circumstances here. In so doing two facts are important to remember: first, under ERISA a court had discretionary power to award attorney fees and interest. *See Central States Southeast and Southwest Areas Pension Fund v. Hitchings, supra; Huge v. Reid*, 468 F.Supp. 1024 (N.D.Ala.1979); *Huge v. Maximeadows Mining Company*, 459 F.Supp. 267 (N.D.Ala.1978); *Huge v. Old Home Manor, Inc.*, 419 F.Supp. 1019 (W.D.Pa.1976). Second, Article XIV, Section 4 of the Pension Trust Agreement and Article XI, Section 4 of the Health and Welfare Trust Agreement, both of which form the foundation of Alco's obligations, provide for interest on delinquent contributions "together with all expenses of collection incurred by the Trustees, including, but not limited to attorney fees and such fees for late payment as the Trustees determine and as permitted by law".

## V.

### 1.

As is usual in these kinds of cases, the statute is silent on the issue of retroactive application. The legislative history, while saying much about the problems concerning Congress, does not provide "an express indication as to how [its] general language . . . was intended to be applied" to the question at hand. *Seals v. Quarterly County Court*, 562 F.2d 390, 394 (6th Cir. 1977).

What the Court can draw from an examination of the 1980 amendments is that Congress was conscious of the need to specify an effective date other than the date of enactment in some cases, and on occasion discussed the matter in floor debate.

For example, Section 108 of the 1980 amendments (Transition Rules and Effective Dates) contains several provisions relating to the effective date of various amendments to Title IV of ERISA (Plan Termination Insurance). In general the Title IV amendments were to take effect on the date of enactment of the 1980 amendments, except that certain provisions affecting withdrawal liability and transfers among plans were to take effect on April 29, 1980 and other provisions relating to multiemployer plan reorganization were to take effect at certain times in the future. In another instance, Section 302 of the 1980 amendments (Definition of Multiemployer Plan) defining the term "multiemployer plan" was limited in certain cases to the future. Representative Thompson, sponsor of the legislation in the House of Representatives, made clear that the "change in the definition of a multiemployer plan is intended to be prospective only." 126 Cong. Rec. H7902 (daily ed. August 26, 1980).

### 2.

The 1980 amendments, and particularly Section 306, were a follow through on Congress' original purposes in enacting ERISA to "stabilize the rights and liabilities involved in benefit plans established under collective bargaining agreements . . . and to protect participants of these plans by providing them with legal remedies, sanctions and access to federal courts to secure redress for violations of ERISA." *Laborers Fringe Benefit Fund v. Northwest Concrete and Construction, Inc.*, 640 F.2d 1350 at 1352 (6th Cir. 1981). Enactment of the 1980 amendments was the culmination of a three-year effort [7] on the part of Congress to deal with the problems caused by employer withdrawals and employer delinquencies in multiemployer pension plans. The legislative history of the 1980 amendments, particularly Section 306, amply defines Congress' concerns and what it intended to accomplish.

### A.

Section 306 had its genesis in S.3017, the ERISA Improvements Act of 1978, introduced in the Senate in 1978 and reintro-

---

7. "[The 1980 amendments are] the product of almost 3 years of hard work and close interactions among the administration, the Congress and numerous interested groups from the private sector". 126 Cong.Rec. S10099 (daily ed. July 29, 1980) (remarks of Sen. Javits).

duced in 1979 as S.209. As explained by the Senate Committee on Labor and Human Resources:

"Delinquent Contributions—Sections 154(b) and 153(3) and (4)

The problems caused by delinquencies in such plans, brought to the Committee's attention previously, have been reemphasized in connection with the Committee's consideration of legislation to amend title IV of ERISA. The importance of timely receipt of previously agreed upon periodic contributions to a collectively bargained multiple employer plan is great. Section 516 reflects the Committee's views that the collectively bargained obligation of an employer to contribute to such a plan merits special treatment under ERISA, and that sole reliance on widely varying state laws governing suits to collect delinquent contributions is both insufficient and unnecessarily costly.

.    .    .    .    .

Because of the costs of litigation and pre-litigation legal work which are frequently involved in efforts to collect delinquent contributions and because of the importance of timely contributions in connection with the funding requirements for multiple employer plans, the Commit-

tee believes that an additional incentive for timely payment is necessary. This is accomplished by new ERISA section 502(g)(2) (added by bill section 153(4)), under which reasonable attorneys' fees and costs of the action must be awarded to the plan in section 516 suits in which a judgment in favor of the plan is awarded."

Staff of Senate Comm. on Labor and Human Resources, 96th Cong., 1st Sess., *S.209, The ERISA Improvements Act of 1979: Summary and Analysis of Consideration* (Comm.Print.1979) at 45.[8]

No final action was taken by the Ninety-Fifty Congress on S.3017 or by the Ninety-Sixth Congress on S.209.

## B.

The 1980 amendments were an amalgamation of H.R.3904 and S.1076, introduced in the 96th Congress on May 3, 1979. The bills were identical as introduced and did not contain the antecedents to section 306.[9]

As reported out by the House Committee on Ways and Means, H.R.3094 provided for assessment of attorney fees and liquidated damages in an action to collect delinquent

---

**8.** Section 262 of S.3017 provided a federal cause of action for delinquent contributions accompanied by mandatory attorney fees if successful. It contained no provision for liquidated damages. The Department of Labor opposed S.3017 as premature and also opposed the mandatory attorney fees, believing the discretionary right to make an award under section 502(g) of ERISA was adequate. The National Coordinating Committee for Multiemployer Plans supported Section 262 and urged inclusion of a provision requiring payment of an amount equal to delinquent payments as liquidated damages. *See ERISA Improvements Act of 1978: Joint Hearings Before the Subcommittee on Labor of the Committee on Human Resources and the Subcommittee on Private Pension Plans and Employee Fringe Benefits of the Senate Committee on Finance,* 95th Cong., 2d Sess., 38, 42, 149–151, 183, 414, 419 (1978).

Sections 153 and 154 of S.209 followed the language of Section 262 of S.3017 regarding attorney fees and a federal cause of action, respectively. In introducing S.209, Senator Javits, one of its sponsors, said with reference to Section 153, "The imposition of this new

statutory duty will particularly help multiemployer plans collect delinquent employer contributions." The Department of Labor supported many of the provisions of S.209 but continued to oppose mandatory attorney fees because "... we think that the courts should have the discretion to decline to oppose fees and costs on employers on a case-by-case basis—for example in some instances where an employer's delinquency in making contributions is due to an honest dispute over coverage by the plan." The National Coordinating Committee for Multiemployer Plans continued to urge double payment of delinquent contributions as damages. *See ERISA Improvements Act of 1979: Hearings Before the Senate Committee on Labor and Human Resources,* 96th Cong., 1st Sess., 37, 40, 106, 154, 200 and 293 (1979).

**9.** As introduced, H.R.3904 and S.1076 were concerned primarily with improving ERISA's termination insurance program for multiemployer pension plans. *See Multiemployer Pension Plan Amendments Act of 1979: Hearings Before the Committee on Labor and Human Resources,* 96th Cong., 1st Sess. (1979).

contributions when a plan so provided. The Committee explained:

> "7. Enforcement—liquidated damages with respect to delinquent contributions
>
> Under the bill, in the case of an action to collect withdrawal liability, a court may award a plan liquidated damages. The Committee has concluded that in certain situations, reasonable attorneys fees, court costs, and liquidated damages should be awarded to a plaintiff in an action to collect delinquent plan contributions.
>
> The Committees amendment provides that in the case of a civil action by any person to collect delinquent multiemployer plan contributions, regardless of otherwise applicable law, the court before which the action is brought may award the plaintiff (1) reasonable attorneys fees, (2) court costs, and (3) liquidated damages not to exceed 20 percent of the amount of delinquent contributions as determined by the court. However, these items are to be awarded to a plaintiff only to the extent that the multiemployer plan in question provided for such an award. The bill preempts any State or other law which would prevent the award of reasonable attorneys fees, court costs or liquidated damages or which would limit liquidated damages to an amount below the 20 percent level. However, the bill does not preclude the award of liquidated damages in excess of the 20 percent level where an award of such a higher level of liquidated damages is permitted under applicable State or other law. The Committee amendment does not change any other type of remedy permitted under State or Federal law with respect to delinquent multiemployer plan contributions."

H.R.Rep. No. 869, 96th Cong., 2d Sess. (1980) Part II at 48–9 U.S.Code Cong. & Admin.News 2918, 3037–3038.[10]

On the other hand, S.1076 as reported out of committee contained what eventually became Section 306 in its present form. As explained by the Senate Committee on Labor and Human Resources:

> "3. Delinquent Contributions (Bill section 308; proposed ERISA section 515)
>
> Delinquencies of employers in making required contributions are a serious problem for most multiemployer plans. Failure of employers to make promised contributions in a timely fashion imposes a variety of costs on plans. While contributions remain unpaid, the plan loses the benefit of investment income that could have been earned if the past due amounts had been received and invested on time. Moreover, additional administrative costs are incurred in detecting and collecting delinquencies. Attorneys fees and other legal costs arise in connection with collection efforts.
>
> These costs detract from the ability of plans to formulate or meet funding standards and adversely affect the financial health of plans. Participants and beneficiaries of plans as well as employers who honor their obligation to contribute in a timely fashion bear the heavy cost of delinquencies in the form of lower benefits and higher contribution rates. Moreover, in the context of this legislation, uncollected delinquencies can add to the unfunded liability of the plan and thereby increase the potential withdrawal liability for all employers.
>
> Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously. Sound na-

---

**10.** H.R.3904 was also referred to the House Committee on Education and Labor. Its report, H.R.Rep. No. 869, 96th Cong., 2d Sess.

(1980) Part I, did not discuss attorney fees or liquidated damages.

tional pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises.

The public policy of this legislation to foster the preservation of the private multiemployer plan system mandates that provision be made to discourage delinquencies and simplify delinquency collection. The bill imposes a Federal statutory duty to contribute on employers that are already contractually obligated to make contributions to multiemployer plans. A plan sponsor that prevails in any action to collect delinquent contributions will be entitled to recover the delinquent contributions, court costs, attorney's fees, and double interest on the contributions owed. The intent of this section is to promote the prompt payment of contributions and assist plans in recovering the costs incurred in connection with delinquencies." [11]

Staff of Senate Comm. on Labor and Human Resources, 96th Cong., 2d Sess., *S.1076, The Multiemployer Pension Plan Amendments of 1980: Summary and Analysis of Consideration (Comm.Print 1980)* at 43–4.

In the floor debate in the House, Representative Thompson, one of the sponsors of H.R.3904, repeated almost word-for-word the explanation for Section 306 set forth in the Senate committee report. He concluded his remarks by saying:

"It is intended that the specific provisions of this section concerning interest and liquidated damages are not limitations on the amounts otherwise set forth in collective bargaining agreements or plan documents; they constitute a minimum, not a maximum. For example, we understand that there are multiemployer plans which currently provide, in the event of employer contribution delinquency, for the payment of interest and liquidated damages which are in excess of the provisions of this section. Such practice will not be affected by the provisions

of this section which directs a court to award unpaid contributions, interest, liquidated damages," reasonable attorney's fees, and costs as well as where the plan does not sufficiently address such items."

126 Cong.Rec. H7899 (daily ed. August 26, 1980).

While the 1980 amendments as enacted were in form from H.R.3904, Section 306 as enacted was in fact from S.1076. Final action took place in the House and Senate on September 19 and 23, 1980, respectively, after conference resolution of differences not germane here.

### C.

From the conception of Section 306 in 1978 to its birth in 1980, its gestation period was accompanied by an acute parental concern over the adverse effect of delinquencies on multiemployer plans and the need to strengthen ERISA to enhance the ability of multiemployer plan trustees to enforce employer obligations to make contributions and to discourage delinquency.

What was said by the Court of Appeals for the Sixth Circuit in *Laborers Fringe Benefits Funds, supra* at 1352, regarding Section 502 of ERISA is equally applicable to Congressional intent regarding the legislative history of Section 306:

"The legislative history . . . indicates that Congress intended that the enforcement provisions should have teeth: the provisions should be liberally construed 'to provide both the Secretary and participants and beneficiaries with broad remedies for redressing or preventing violations of the Act.' H.R.Rep. No. 93–533, 93rd Cong., 2nd Sess., 17."

### VI.

■■■ Although the text of the 1980 amendments indicates some Congressional awareness of the question of retroactive application and the legislative history strongly emphasizes the remedial nature of Section 306 and Congressional concern over

---

**11.** Because S.1076 was also referred to the Senate Committee on Finance there was no formal committee report, since Senate Rule XXVII requires a joint report under such circumstances.

the problems caused by delinquent contributions, the lack of an explicit statement concerning application of the 1980 amendments to pending cases requires that the Court determine whether it would be manifestly unjust to apply Section 306 in this case. In other words, would it be manifestly unjust if the Court were obligated to award Central States an attorney fee and liquidated damages in the form of a double interest payment?[12]

1.

The January 1977 complaint as filed contained two counts. In Count 1, Central States asserted a claim for delinquent contributions based on Alco's failure to comply with Section 502 of ERISA, 29 U.S.C. § 1132, and breach of the collective bargaining and trust agreements. In Count 2, Central States asked for an award of attorney fees and again cited the terms of the trust agreement and Section 502(g) of ERISA, 29 U.S.C. § 1132(g). By adding Section 515 to ERISA, Section 306 of the 1980 amendments simply turned these claims for relief into a cause of action under federal law. In the Court's judgment, Section 306 does nothing manifestly unjust, nor does it take away from Alco any substantive right or impose on it any unanticipated substantive obligation.

In *Pedreyra v. Cornell Prescription Pharmacies, Inc.*, 465 F.Supp. 936 (D.Colo.1979), the court allowed plaintiff to pursue a claim for retaliatory discharge in an employment discrimination action even though the cause of action for retaliatory discharge was created by Congress after the suit commenced. See 29 U.S.C. §§ 215(a)(3), 216(b). The court held creation of a private cause of action was not a change in substantive law but rather in procedure, since formerly only the Secretary of Labor could bring suit, a lengthy and inefficient process. What Congress had done, the court concluded, was not create a new right but merely afforded a better remedy for enforcement of an existing right. 465 F.Supp. at 943.

In *Grenier v. U.S. Internal Revenue Service*, 449 F.Supp. 834 (D.Md.1978), the court held replacement of the Freedom of Information Act with an amended provision of the Internal Revenue Code as the means for obtaining information from the IRS applied retroactively. It also noted "... statutes which relate to remedies ... are generally given retrospective application and applied to cases pending at the time of enactment ...." 449 F.Supp. at 842.[13]

Certainly Alco was at all times obligated to make the agreed upon contributions to Central States. Once delinquent, Central States had a cause of action under the collective bargaining agreement and the trust agreement if not Section 502(a)(3)(B)(ii) ("a civil action may be brought ... to enforce ... the terms of the plan"). Congressional action giving an explicit statutory cause of action to Central States to sue for delinquent contributions certainly worked no injustice on Alco nor imposed an unanticipated substantive obli-

---

**12.** It is beyond debate that double interest is a form of liquidated damages and not a penalty. In *Robertston v. Argus Hosiery Mills*, 121 F.2d 285 (6th Cir. 1941), the Court of Appeals for the Sixth Circuit held the award of double wages under the Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b), amounted to liquidated damages and not a penalty. The court noted that the statute characterized double wages as damages and [it saw] "no reason for delving beneath this unequivocal term in order to spell out a meaning at variance with the intent expressed". 121 F.2d at 286. *See also: Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942); *Culver v. Bell & Loffland, Inc.*, 146 F.2d 29 (9th Cir. 1944).

**13.** *See also: Koger v. Ball*, 497 F.2d 702 (4th Cir. 1974) (Section 717(c) of the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 42 U.S.C. § 2000e–16, amending Title VII of the Civil Rights Act of 1964 to allow for a civil action by approved federal government employees in contrast to an exclusive administrative remedy, held to have retroactive effect); *Puntolillo v. New Hampshire Racing Commission*, 390 F.Supp. 231 (D.N.H.1975)(retroactive effect given to that portion of the Equal Employment Opportunity Act of 1972 amending the definition of "employer" to provide coverage for state employees, 42 U.S.C. § 2000e(b)). For application of the rule in a criminal case, *see Landay v. United States*, 108 F.2d 698 (6th Cir. 1939).

gation or took away any substantive right, especially since required contributions are owed in the same manner as wages. *See United States v. Carter*, 353 U.S. 210, 217–18, 77 S.Ct. 793, 797, 1 L.Ed.2d 776 (1957).

2.

As to the mandatory award of attorney fees to Central States, the Court already had discretion to make such an award under ERISA. Consequently, Alco was certainly on notice that it might be subject to an attorney fee award should it not prevail. Similarly, the trust agreement under which Alco was being sued provided it was to pay the reasonable expenses of Central States in making collection of delinquent contributions.[14]

There is little difference between giving retroactive effect to (1) a statute which requires the award of attorney fees where formerly the Court had discretion to award such fees; and (2) a statute which gives the Court the discretion to award attorney fees where formerly there was no statutory authority to make the award. The precedent for retroactivity in the latter case is overwhelming. In both *Bradley, supra,* and *Northcross, supra,* statutes authorizing awards of attorney fees were given retroactive effect.

In *Overseas African Construction Corp. v. McMullen*, 500 F.2d 1291 (2nd Cir. 1974), an amendment to the Longshoremen's and Harbor Workers' Compensation Act providing that a claimant who successfully prosecuted his claim over the resistance of the carrier had an absolute right to recover his legal expenses, 33 U.S.C. § 928(a), was held to apply to cases pending on its effective date. The Court of Appeals quoted *Sampeyreac v. United States*, 32 U.S. (7 Pet.) 222, 238, 8 L.Ed. 665 (1833), that "almost

every law, providing a new remedy, affects and operates upon causes of action existing at the time the law is passed." 500 F.2d at 1297.

In *Beazer v. New York City Transit Authority*, 558 F.2d 97 (2nd Cir. 1977), the same count found no manifest injustice in applying the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, to a plaintiff successful under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964 "even though [the act] was enacted after most of the services . . . were rendered." 558 F.2d at 100.

In *Weisenberger v. Huecker*, 593 F.2d 49 (6th Cir. 1979), the Court of Appeals similarly followed the principle that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary", *Bradley, supra* 416 U.S. at 711, 94 S.Ct. at 2016, to hold that the Civil Rights Attorney's Fees Awards Act of 1976 applied to a pending action under 42 U.S.C. § 1983; the court also held fees could be awarded for legal services performed in pursuit of attorney fees. 593 F.2d at 53–4.[15]

That Alco is obligated to pay Central States attorney fees certainly should come as no surprise. Whether the awarding of fees is in the Court's perspective discretionary or obligatory, Alco is obligated. *See Central States v. Hitchings Trucking, Inc., supra.*

3.

The double interest proviso of the 1980 amendments must likewise be given retroactive effect, making it applicable to cases pending on its effective date. As the Court

---

14. Article XIV, Section 4 of the Trust Agreement expressly provides for interest, attorney fees, expenses of collection and "such fees for late payment as the Trustees determine and as permitted by law". *See Bugher v. Ohio Pipeline Construction Co.*, 392 F.Supp. 687 (S.D. Ohio 1975).

15. In *Weisenberger*, the Court of Appeals specifically noted the relationship between the decision in *Alyeska Pipeline Service Co. v. Wil-*

*derness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), and the subsequent enactment of the Civil Rights Attorney's Fee Award Act of 1976, which in essence obviated *Alyeska*. The Court of Appeals' remand of an earlier district court decision regarding attorney fees, 500 F.2d 1279 (6th Cir. 1974), required by *Alyeska*, was in effect nullified by the congressional action.

has already described,[16] Congress clearly intended this provision to be remedial; it arose out of an acute concern over the adverse impact of delinquencies on employee benefit plans and was intended to discourage failure to make payments when due. Congress was aware that in some instances there might be a legitimate dispute over the exact amount currently owing,[17] but determined in all instances of delinquencies to require payment of double interest as compensation for the damage occasioned by the failure of a trust to receive payments as due.[18] Importantly, Congress did not arbitrarily choose double interest as the amount due but rather listed it as an alternative: Section 502(a) requires that the court award the greater of double interest or the amount specified in the agreement of the parties up to 20% of the amount of delinquent contributions.[19]

Certainly Alco had no vested right not to make the required payments; the fact that it is required to compensate Central States for the damages suffered by its failure to make its required payments, albeit under a formula, does not impose an unanticipated burden. The Court finds no manifest injustice in such a requirement. The obligation to respond in damages for failure to make required payments is certainly not new. See Jensen v. Garvison, 274 F.Supp. 866 (D.Or.1967).

While the parties cite no case directly in point, certainly support for retroactive application of Section 502 can be found in those cases which have retroactively applied statutes shifting the interest due date from the time of judgment to the time of filing the complaint. See Ballog v. Knight Newspapers, Inc., 381 Mich. 527, 164 N.W.2d 19 (1969). Similarly, cases such as E.I. DuPont de Nemours & Co. v. Lyles & Lang Construction Co., 219 F.2d 328 (4th Cir. 1955), and Employer-Teamsters Joint Council No. 84 Health and Welfare Fund v. Weatherall Concrete, Inc., 468 F.Supp. 1167 (S.D.W.Va. 1979), which have established or upheld variable interest on unpaid judgments keyed to market rates, also support the Court's conclusion.[20]

Simply nothing to which Alco is entitled has been taken from it by requiring that it pay statutory liquidated damages in the form of double interest on the amounts found due Central States in this action.

4.

Arguing against retroactive application of the 1980 amendments to this case, Alco cites Swinton v. J. Frank Kelly, Inc., 554 F.2d 1075 (D.C.Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976), Hospital Employees Labor Program of Metropolitan Chicago v. Ridgeway Hospital, 570 F.2d 167 (7th Cir. 1978) and Jensen v. Gulf Oil

16. See discussion in Part V(2), supra.

17. See note 8 and accompanying text, supra.

18. See Part V(2)(B), supra.

19. Under the Fair Labor Standards Act, 29 U.S.C. § 216(b), the amount awarded as liquidated damages is equal to the amount of unpaid wages. See note 12, supra. In United Order Of American Bricklayers and Stone Masons Union No. 21 v. Thorleif Larsen and Son, Inc., 519 F.2d 331 (7th Cir. 1975), a contractual liquidated damages provision for 10% of the amount due was held enforceable even though that amount bore no relationship to the length of delay in payment.

20. E.I. DuPont was an action by a subcontractor against a contractor for amounts due under the subcontract. Attempting to determine a fair value to which plaintiff was entitled under the subcontract, the court held interest should be computed not at the legal rate fixed by statute but at the market rate plaintiff would have had to pay upon a loan of a similar amount.

Employer-Teamsters was an action to collect delinquent contributions under a collective bargaining agreement and trust fund. The court found that defendant breached a pre-existing duty to pay a liquidated sum of money and followed the rule that where damages are ascertainable with mathematical precision prejudgment interest is awardable as a matter of right. Following the reasoning of E.I. DuPont, the court found defendant liable for prejudgment interest at a rate which would compensate plaintiffs for the delay in receipt of their money. Rather than using the statutory interest rate the court established interest at the market rate plaintiffs would had to have paid upon a loan of a similar amount.

See also: Nedd v. United Mine Workers of America, 488 F.Supp. 1208 (M.D.Pa.1980).

*Refining and Marketing Co.*, 623 F.2d 406 (5th Cir. 1980). The Court finds each distinguishable.

*Swinton* involved a change in the review procedures of compensation claims under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq*; Congress amended 33 U.S.C. § 921(b) to provide for appeals from claim rejections by a deputy commissioner to an appeals board and then to the court of appeals rather than to the district court.[21] In reviewing applicability of the amendment on its own motion, the Court of Appeals followed the principle that where legislative language and history are noncommittal the court must look to judicial precedent and policy for guidance and, citing *Claridge Apartments v. Commission*, 323 U.S. 141, 65 S.Ct. 172, 89 L.Ed. 139 (1944), found a judicial preference for prospective as opposed to retrospective legislation. The court noted the dislocation which would occur if the plaintiff were required to go back into the administrative process, and concluded the amendment was not applicable to pending appeals. While not citing *Bradley, supra*, much less distinguishing it, the Court of Appeals was obviously concerned with "the folly and inequity of returning [the claimant] to the administrative process ...". 554 F.2d at 1081. Neither the award of attorney fees nor the assessment of liquidated damages in this case will result in "folly" or "inequity".

In *Hospital Employees*, at issue was the retroactive effect of a provision of the Labor Management Relations Act, 29 U.S.C. § 152(2), which established federal jurisdiction in actions claiming breach of the contractual obligation of non-profit hospitals to arbitrate labor disputes; the breach there had occurred after the effective date of the statutory amendment establishing jurisdiction.[22] The Court of Appeals, citing *Brad-*

*ley, supra*, held that the effect of the amendment was to create a new substantive right rather than to simply make available a new forum, and to impose upon the hospital "unforeseen obligations". 570 F.2d at 170. Important to the court's decision was the prior holding of the Supreme Court in *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), that federal substantive law was to be applied in these matters and that state law was not an independent source of private rights. Since the hospital's refusal to arbitrate gave rise to a "matured right", 570 F.2d at 170, applying the amendment retroactively would have extinguished that right contrary to *Bradley*. In this case there is certainly no right in Alco either not to pay damages for failure to make required contributions or to have the court decline to award attorney fees.

In *Jensen*, the Court of Appeals was faced with whether an employee forced to retire under circumstances subsequently made unlawful by an amendment to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*,[23] should have a claim for relief. Following a detailed discussion of the statute and its legislative history, the court held that neither could support a conclusion that the amendment was to apply retroactively. Then applying the three-fold *Bradley* test,[24] the court found the private employer had relied on a substantive contractual right in forcing the employee's retirement and that it would be deprived of that right if the amendment were deemed retroactive. It concluded the employer's "reasonable expectation that its conduct would be valid" would be frustrated if its earlier lawful-when-taken actions were now challenged, a result the court found manifestly unjust. 623 F.2d at 413. Certainly Alco had no basis for a reasonable

---

**21.** Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub.L. No. 92–576, 86 Stat. 1251, § 15(b).

**22.** Non-Profit Hospital Amendments, Pub.L. No. 93–360, 88 Stat. 395 (1974).

**23.** At the time the employee was forcibly retired it was not unlawful to force retirement at age 65. Section 2(b) of Pub.L. No. 95–256, 92 Stat. 189 (1978), amended 29 U.S.C. § 623(f)(2) to make the forced retirement suffered by the plaintiff unlawful.

**24.** *See* Part IV(1), *supra*.

expectation that should it fail to pay required contributions it would not have to respond in damages.

In short, Congress enacted the 1980 amendments to solidify what was previously a flexible remedy for delinquent contributions to multi-employer benefit plans and trust funds; discretionary authority in the federal courts to award attorney fees and interest was made mandatory and buttressed with the awarding of double interest as an additional remedy. Nothing contained in Section 306 of the 1980 amendments deprives Alco of a "vested right" or imposes on it a "penalty"[25] or an unanticipated burden resulting in manifest injustice.

## VII.

Central States asks for an award of attorney fees in the amount of $24,450. In support of its request it has submitted a detailed statement describing the hours worked, date, name of attorney, nature of work and hourly rate. The $24,450 represents 327 hours of work by four lawyers over approximately eighteen months at the rate of $75 per hour. Not included is some $8,000 paid to attorneys who represented Central States in this case prior to July 1979 or any amounts paid in connection with the issues now before the Court.

Alco, without a counter-affidavit, argues the amount requested is unreasonable because this was an uncomplicated matter, the hours worked were duplicative (119 hours) and in many cases unnecessary. Alco also asserts that the overall requested rate of $75 per hour is excessive as to one of the lawyers and for certain of the work. While not saying so expressly, Alco appears to take the position some of the work, such as noticing depositions, could have been performed by para-legals.

Central States responds by explaining in detail that 72 out of the 119 hours Alco claims are duplicative in fact represent different kinds of work and only 49 hours represent a collaborative effort. Central States also argues that the legal issues involved were complex and represented more than a simple contract dispute and the hourly rate is reasonable considering the type of services performed and who performed them.

### 1.

In *Northcross v. Board of Education of the Memphis City Schools*, 611 F.2d 624 (6th Cir. 1980), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980), the Court of Appeals for the Sixth Circuit established definitive criteria for review of applications for attorney fees. While the statute involved in *Northcross* was the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, the criteria established are equally applicable under 29 U.S.C. § 1132(g);[26] both statutes provide for a "reasonable attorney's fee".

Under the criteria established in *Northcross*:

> there is to be a uniform approach to awarding attorney fees with clear and adequate findings of fact on the record; an award which is arbitrary or conclusory is not reasonable. 611 F.2d at 636.
>
> — a fee calculated in terms of hours of service is the fairest and most manageable approach. The hours claimed need not be automatically accepted; any hours rejected must be explained. Hours may be cut for duplication, padding, or frivolous

---

**25.** *Cf. Helm v. Bollman*, 176 Cal.App.2d 838, 1 Cal.Rptr. 723 (Ct.App.1959) (amendment to statute providing for double damages where prior thereto damages were *fixed* in amount equal to actual harm held a penalty). Not only were damages under ERISA not fixed, Congress specifically correlated the double interest remedy in the 1980 amendments to actual damages. *See* Part V(2)(B), *supra*.

**26.** In certain circumstances it appears *Northcross* need not be followed. *See Grinnell Brothers, Inc. v. Touche Ross & Co.*, 655 F.2d 725 (6th Cir. 1981). For a more general discussion of the question of attorney fees, *see* Survey, Flexibility and Fairness—Sixth Circuit Jurisprudence Under The Civil Rights Attorney's Fees Awards Act, 12 *Univ. of Toledo L.Rev.* 623 (1981); R. Aronson, *Attorney-Client Fee Arrangements: Regulation and Review* (Federal Judicial Center 1980).

claims. In complicated cases the court may arbitrarily deduct a small percentage of the total hours to eliminate duplication. All time reasonably spent on the matter is entitled to be compensated. 611 F.2d at 636–37.

— the hourly rate should vary depending upon the type of service being performed. "...[the] mandate [is] to award fees 'as is traditional with attorneys compensated by a fee-paying client,' [and therefore] a scale of fees as is used by most law firms is appropriate to use .... The use of broad categories, differentiating between para-legal services, in-office services by experienced attorneys and trial service ... [is] fair and equitable ...." 611 F.2d at 638.

— in determining the level of compensation the court should look to the marketplace, which normally reflects in the hourly rate charged by an attorney his or her training, background experience and skill. 611 F.2d at 638.

As summarized by the Court of Appeals:

"We have learned through experience, however, that merely providing a check list of factors to consider does not lead to consistent results, or, in many cases, reasonable fees. Many of the factors are overlapping, and there is no guidance as to the relative importance of each factor, or indeed, how they are to be applied in a given case. We conclude that an analytical approach, grounded in the number of hours expended on the case, will take into account all the relevant factors, and will lead to a reasonable result. The number of hours of work will automatically reflect the 'time and labor involved,' 'the novelty and difficulty of the question,' and 'preclusion of other employment.' The attorney's normal hourly billing rate will reflect 'the skill requisite to perform the legal service properly,' 'the customary fee,' and the 'experience, reputation and ability of the attorney.' Adjustments upward may be made to reflect the contingency of the fee, unusual time limitations

and the 'undesirability' of the case. Thus, applying the approach used in this decision will result in an award reflecting those considerations traditionally looked to in making fee awards, but will also provide a logical, analytical framework which should largely eliminate arbitrary awards based solely on a judge's predispositions or instincts."

611 F.2d at 642–43.

### 2.

■ Aside from an analysis of what it considers a duplication in hours charged, Alco has only presented the Court with argument in its attack on the amounts requested by Central States. It has not requested an evidentiary hearing to support its claims that the number of hours described were excessive considering the matters in issue or that the hourly rate charged was excessive in view of the experience of one of Central States' lawyers and the nature of the work. Central States appears to have successfully answered the charge of duplication in its response to Alco's analysis. Therefore the Court must conclude that of the 324 claimed hours of work only 49 hours represent collaboration, leaving 275 hours of individual work.

These 275 hours are adequately explained by Central States; the $75 per hour charged is the normal billing rate of the several lawyers involved. There is nothing before the Court to suggest padding or that the matter was frivolous or that a different hourly rate is customarily charged in the marketplace for certain kinds of the legal services enumerated. The Court is therefore constrained to award Central States an attorney fee of $20,625.

### 3.

Some additional comment is in order. While this was not a frivolous matter, for the most part it was not a complex matter. Suit was started in January 1977 to recover approximately $23,000. Whether Alco was obligated to pay that amount depended in large measure on interpretation of the language of the collective bargaining and trust

agreements. What portion of the $56,-348.62 eventually due for the period April 1, 1975 to March 31, 1978 represented amounts due for the April 1, 1976 to March 31, 1978 period was not stated in the judgment. A breakdown of this $58,348.62 would have defined the real dollars in dispute as distinguished from the simple collection aspect of this case.

Second, while there is no dispute that the attorney hours claimed by Central States were actually worked, there is no explanation why it took so many lawyers so much time to bring this case to a successful conclusion. The parties finally stipulated the facts which allowed the Court to decide the disputed issue of language interpretation. Again, while pre-trial discovery may have been a necessary prelude to the fact stipulation, there is no explanation why it took so much time to develop what appears to have been a relatively simple stipulation.

Lastly, there is no explanation why many of the ministerial tasks performed by the attorneys for which they charged the full rate of $75 per hour could not have been performed by para-legals or other persons of lesser skills.

The Court has made an award of attorney fees in an amount almost equal to the amount in dispute. The saving grace is that throughout Alco knew, or should have known, exactly what was happening; by agreeing to a partial summary judgment or paying the undisputed amount of delinquent contributions it would have stopped or at least slowed down the lawyer's clock. ERISA allowed the Court in its discretion to award attorney fees. Each hour Alco's failure to pay the delinquent contributions allowed Central States to employ attorneys was an hour which Alco at some later day faced the prospect of paying for.

## VIII.

Central States may submit a form of judgment in its favor computing amounts still due as described above.

SO ORDERED.