**LABORERS CLEAN–UP CONTRACT ADMINISTRATION TRUST FUND,**
Plaintiff-Appellee,

v.

**URIARTE CLEAN–UP SERVICE, INC.,**
Developers Clean-Up, Roland G. Uriarte, Frank Uriarte, Ira Kay, and Joe Mercado, Defendants-Appellants.

Nos. 83–6087, 83–5845.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 6, 1984.

Decided June 29, 1984.

Steven D. Atkinson, Atkinson, Andelson, Loya, Ruud & Romo, Long Beach, Cal., for defendants-appellants.

Barry Jablon, Cox, Castle & Nicholson, Los Angeles, Cal., Joseph Mercedo, Glendale, Cal., for plaintiff-appellee.

Before CHOY, NELSON, and CANBY, Circuit Judges.

CANBY, Circuit Judge:

This action was brought under section 301(a) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185(a), and section 502(e) of the Employment Retirement Income Security Act of 1974 (ERISA), as amended, 29 U.S.C. § 1132(e), to recover wages and fringe benefit contributions allegedly owing under a collective bargaining agreement. The district court determined that wages and fringe benefits were due and awarded damages to plaintiff, including interest and attorneys' fees. Defendants appeal.

### I

Defendants are engaged in the business of contracting to clean up construction sites. The record indicates that the history of such businesses in Southern California has been a troubled one. Intense competition led contractors to avoid costs in almost any way possible. Frequent victims were the employees who were often noncitizens with little or no command of the English language. Although employees bargained collectively for wages and fringe benefits, they were powerless to enforce the terms of their collectively bargained agreements. All too often, employers paid only a fraction of the wages and fringe benefit payments bargained for by the employees' union.

Recognizing these problems, the clean-up contractors in 1977 formed an employers association to bargain collectively with the clean-up employees' union. By the Master Labor Agreement of September 1, 1977 (1978 Agreement), negotiated between the association and the union, the Laborers Clean-Up Contract Administration Trust Fund was established to monitor and enforce the wage and fringe benefit obligations of signatory clean-up contractors. Under the terms of the 1978 Agreement, signatory clean-up contractors were required to make fringe benefit payments to four trusts: the Construction Laborers Pension Trust, the Laborers Health and Welfare Trust, the Construction Laborers Vacation Trust (collectively referred to as the Laborers Trusts), and the Laborers Clean-Up Contract Administration Trust (the Clean-Up Trust). Payments were to

be made at a specified rate for each hour worked by covered employees.

The 1978 Agreement, however, did not eliminate the problem of employers evading their contractual obligations to employees. Because clean-up contractors often maintained inadequate payroll records, auditors could not determine the actual number of hours worked by covered employees. Consequently, enforcement of the 1978 Agreement was virtually impossible.

In recognition of the continued problems facing the industry, the parties to the 1978 Agreement adopted a verifiable standard for determining the number of hours for which contributions would be payable. Under the proposed standard, hours were to be computed under a formula capable of converting the square footage to be cleaned into the number of hours actually worked to complete it. The new standard was embodied in the amended Master Labor Agreement effective for the years 1979–82 (the 1979 Agreement). Under the 1979 Agreement, signatory contractors computed their liability to the trust funds on the basis of the applicable square footage standard rather than on the basis of actual hours worked. For contracts entered into between April 1, 1979 and December 31, 1979, the applicable standard was one hour of contribution at the specified rate for every 100 square feet. For contracts entered into after December 31, 1979 and before September 1, 1980, the standard was one hour for every 65 square feet. Beginning with contracts entered into on or after September 1, 1980, signatory contractors were required to make one hour's contribution for every 54 square feet.

Defendants Uriarte Clean-Up Service, Inc. (Uriarte Clean-Up) and Developers Clean-Up (Developers) are affiliated corporations. Roland G. Uriarte, Frank Uriarte, Ira Kay, and Joe Mercado are the officers, directors and sole shareholders of both Uriarte Clean-Up and Developers. Uriarte

Clean-Up executed the 1979 Agreement on November 21, 1980, and thus it was obligated to make wage and fringe benefit payments according to the terms of the 1979 Agreement.[1] Developers, on the other hand, never executed the 1979 Agreement and was thus not obligated by its terms.

Both the 1978 and 1979 Agreements required signatory clean-up contractors to register with the Clean-Up Trust each clean-up project on which covered employees would be employed, and to indicate the square footage of the job and the estimated number of hours required to complete it. As the work was performed, the clean-up contractors were required to submit monthly reports to the Clean-Up Trust identifying the number of hours worked by each covered employee on each registered project during the reporting period. Contributions were payable monthly on the basis of hours reported for that month and were due on the twentieth day of the calendar month following the month in which they were payable. Contributions due but not paid on the twentieth were considered delinquent.

In August 1980, the Clean-Up Trust conducted an audit of Uriarte Clean-Up covering the period January 1, 1978 to March 31, 1979. The audit discovered a delinquency in Uriarte Clean-Up's fringe benefit contributions for the audit period, which was settled by Uriarte's Clean-Up's execution of a promissory note in the amount of $43,500 payable in eight monthly installments of $5,437.50 each. Uriarte Clean-Up made the first two payments but has not paid the remaining six installments. The district court found that Uriarte Clean-Up owed $32,625 on the note together with interest at 16 percent.

A second audit was conducted sometime after May 1982, revealing further delinquencies in Uriarte Clean-Up's fringe benefit contributions. These new delinquencies were computed on the basis of square footage verifications performed by the Clean-

---

1. In addition, defendant Kay executed a personal guarantee of the obligations of Uriarte Clean-

Up under the 1979 Agreement.

Up Trust's field representatives whose job it was to inspect jobs registered by clean-up contractors and verify the square footage being cleaned. In addition, the field representatives verified the square footage of unregistered jobs through the cooperation of general contractors obligated under the collective bargaining agreements to assure that all wages and fringe benefit contributions were made with respect to covered employees. As found by the district court on the basis of the Clean-Up Trust's verifications, Uriarte Clean-Up had substantially underreported the square footage for seventeen projects registered to it and had failed to register and make any fringe benefit contributions for eight other projects. The district court computed the amount of the delinquency by reference to the square footage standards and the hourly contribution rates of the 1979 Agreement.

The delinquency found by the district court included not only unpaid fringe benefit contributions for the unreported hours but also unpaid wages. The district court apparently assumed that the hours reported by Uriarte Clean-Up to the Clean-Up Trust represented all the hours for which covered employees received wages. The principal amount of the delinquency including unpaid wages as calculated by the district court totalled $270,808.14.

On the basis of the district court's findings, final judgment was entered in the amount of $519,071.52, which included $271,438.08 of principal and $247,633.44 of prejudgment interest. In addition, the district court awarded plaintiff $123,948.75 in attorneys' fees. All defendants were held jointly and severally liable for the entire judgment on the ground that Uriarte Clean-Up was the "alter ego" of its sister corporation and of its shareholders.

II

On this appeal, defendants contend that the district court erred in: (1) failing to

grant defendants a longer continuance, (2) miscalculating the delinquency and the amount of interest due thereon, (3) disregarding the corporate form of Uriarte Clean-Up and holding the shareholders jointly and severally liable for the judgment, and (4) awarding an excessive amount of attorneys' fees to the plaintiff. We now turn to these issues.

A. Failure to Grant Continuance.

■ The day before trial was scheduled to begin counsel for defendants sought a continuance because of his involvement in another trial. The court granted the continuance but only until March 2, 1983, three days after defense counsel's other trial concluded. We review the district court's refusal to grant a longer continuance only for abuse of discretion. *Ruiz v. Hamburg-American Line*, 478 F.2d 29, 31–32 (9th Cir.1973).

■ Counsel for defendants contends that there was an abuse of discretion because three days was not enough time for him to prepare for this trial. Although it is true that counsel's law firm first represented all of the defendants on February 7, 1983, the firm had represented defendants Kay and Developers since the outset of this action. The additional representation of the remaining defendants involved no new issues. Therefore, the district court did not abuse its discretion in rejecting the contention of counsel that he needed more time to prepare because he was retained by the remaining defendants eight days prior to the commencement of the scheduled trial date. *See Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

B. Damages[2]

1. Computation of contributions due for contracts entered into prior to April 1, 1979.

■ Uriarte Clean-Up argues that the square footage standards adopted by the

---

**2.** The district court's computation of damages constitutes fact finding and is thus insulated

from review unless clearly erroneous. Fed.R. Civ.P. 52. But because the district court

1979 Agreement do not apply to contracts entered into prior to April 1, 1979.[3] The district court applied the 100 square foot standard of the 1979 Agreement to these contracts.

Article XVI of the 1979 Agreement provides that the 100 square foot standard is effective only as to contracts entered into on or after April 1, 1979. As to contracts entered into before April 1, 1979, Article XIX of the 1979 Agreement provides that the "[s]tandards for clean-up operations presently in effect shall remain effective until March 31, 1979." The Agreement, however, does not specify what standards were "presently in effect." Although the standard under the 1978 Agreement was actual hours worked, Article XVII–D established a minimum standard with respect to each job based on the employer's estimate of the number of hours required to complete it as submitted on the employer's job registration form. The evidence offered at trial supports the conclusion that the practice of the industry, and of Uriarte Clean-Up, was to estimate one hour for every 100 square feet. Thus, it was not error for the district court to use the 100 square footage standard to establish the minimum amount due on all contracts entered into before April 1, 1979.

## 2. Evidence of unpaid wages

■ Defendants contend that there is no evidence to support the district court's conclusion that wages had not been paid for hours not reported to the Clean-Up Trust.[4] The Clean-Up Trust determined that wages had not been paid on the basis of its verification of the square footage of jobs performed by Uriarte Clean-Up. Evidence at the trial established a correlation between the square footage standard and the number of man-hours required to complete a clean-up job.[5] By use of the standards, the Clean-Up Trust was thus able to obtain a rough approximation of the number of hours actually worked by Uriarte Clean-Up's covered employees. Because Uriarte Clean-Up's monthly reports established that wages were paid for fewer hours than were actually worked by covered employees, as evidenced by the square footage standard, there was sufficient evidence for the district court to infer that wages were not paid.

## 3. Completion of jobs

■ Uriarte Clean-Up contends that the number of hours reported on certain jobs is less than that established by the square footage standard because Uriarte Clean-Up did not complete work on those jobs. The only evidence offered to support this contention is that of defendant Kay who testified that Uriarte Clean-Up did no work on one job registered to it, and that he thought, but was not sure, that work was not completed on several other jobs. However, Uriarte Clean-Up never reported to the Clean-Up Trust that it had not completed jobs registered to it. In light of its

---

adopted findings prepared by the prevailing party, we scrutinize its "findings more carefully." *Rickards v. Canine Eye Registration Foundation, Inc.,* 704 F.2d 1449, 1453 (9th Cir.1983).

3. In Uriarte Clean-Up's opening brief, it also contended that an improper square footage standard was applied to contracts entered into after April 1, 1979. However, Uriarte Clean-Up appears to have abandoned this contention in its reply brief.

4. While signatory contractors are required to make only the fringe benefit contributions called for by the Agreements to the Laborers and Clean-Up Trusts, Article XVI–E–2 of the 1979 Agreement authorizes the Clean-Up Trust to collect unpaid wages if in the course of enforcing fringe benefit obligations it determines that wages are due. Collected wages are to be

paid over to the entitled employees if the union is able to identify them. Otherwise, the wages escheat to the Laborer's Health and Welfare Trust Fund.

5. The square footage standard to be effective on September 1, 1980, was submitted to arbitration. The arbitrator selected the 54 square footage standard on the basis of evidence suggesting that a single worker could clean 54 square feet per hour. Consequently, the square footage standard in effect as of September 1, 1980, is a reliable indicator of the probable hours actually worked by employees on any particular clean-up contract. The standards in effect prior to September 1, 1980, actually underestimated the number of hours worked.

failure to do so, the district court could have chosen to disbelieve the self-serving testimony of defendant Kay. Therefore, it was not clearly erroneous to find that all jobs registered by Uriarte Clean-Up had been completed.

### 4. Payments from other contractors

■ Defendants claim that the Clean-Up Trust collected part of the delinquency from other contractors for which Uriarte Clean-Up was never credited. At the trial, defendant Kay testified that certain of the jobs registered to Uriarte Clean-Up had been subcontracted by it to Robert J. Avila and that Avila had made the benefit contributions for those jobs.

Mary Joan Sulprizio, a Clean-Up Trust field representative, testified that Avila did make reports and pay contributions to the Laborers Trusts (but not to the Clean-Up Trust) for months in which jobs registered to Uriarte Clean-Up were performed. However, she indicated that Avila's monthly reports contained no breakdown indicating to which jobs the hours reported should be credited. Moreover, Sulprizio testified that Uriarte Clean-Up never submitted any

documents to the Clean-Up Trust establishing that jobs registered by Uriarte Clean-Up had been assigned or subcontracted to another clean-up contractor. Because the evidence was inconclusive, it was not clearly erroneous for the district court to find that the Avila contributions were not for work performed on jobs registered to Uriarte Clean-Up.

### 5. Interest rate

■ ERISA provides that a judgment on behalf of a fiduciary for unpaid contributions to a multiemployer plan shall include interest on the unpaid contributions, the rate to be as provided by the plan. 29 U.S.C. § 1132(g)(2). The district court determined that the plan had been amended to provide interest at a rate determined by the Federal Reserve discount rate. Defendants argue that Article VIII, § 8.4(b) of the Clean-Up Trust Agreement provides for a seven percent rate of interest on all delinquencies. They contend that this section was never amended. In support of this contention, defendants point out that amendment 12 offered by plaintiff as evidence of the applicable interest rate,[6]

---

**6.** Defendants refer us to plaintiff's Exhibit 405. It provides as follows:

> Article VI, Section 6.04 of the [Pension] Trust Agreement is amended to read as follows:
>> The parties recognize and acknowledge that the regular and prompt filing of individual Employer reports and the regular and prompt payment of Individual Employer contributions and other amounts owed to the Fund is essential to the maintenance in effect of the Pension Plan, and that it would be extremely difficult, if not impracticable, to fix the actual expense and damage to the Fund and to the Pension Plan which would result from the failure of an Individual Employer to make such reports and to pay such monthly contributions and other amounts in full within the time provided. Therefore, the amount of damages to the Fund and Pension Plan resulting from failure to make reports or pay contributions or other amounts within the time specified shall be deemed to include:
>>> (i) interest, plus
>>> (ii) an additional sum equal to the greater of said interest or of the liquidated damages provided for herein.
>> Interest as used herein shall accrue on each amount owed by an Individual Employer from the date such payment became due until

the date on which such payment and all attendant interest and liquidated damages are actually received by the Fund. The rate of said interest shall equal the per annum rate of interest established by the Federal Reserve Board of San Francisco on advances to member banks under Section 13 and 13(a) of the Federal Reserve Act prevailing on the 25th day of the month preceding the date on which such contribution or payments became delinquent plus 5% per annum. Liquidated damages as used herein shall equal the greater of $25.00 or 20% of the amount with respect to which such damages are assessed. These amounts shall become due and payable to the Fund as interest and as liquidated damages and not as a penalty commencing with the day immediately following the date on which the report or the contribution or contributions become due. Liquidated damages shall be paid for each delinquent report, even though a delinquent report shall show no contribution due; and shall be paid in addition to the liquidated damages and interest due on any contributions pertaining to the report. The Trustees, in their discretion, for good cause (and the Trustee shall have the sole right to determine what shall constitute good cause) shall have the right and power to waive

amended Article VI of the Clean-Up Trust Agreement and not Article VIII.

This argument is disingenuous. The amendment to which defendants refer amends Article VI of the Pension Trust Agreement, not Article VI of the Clean-Up Trust Agreement. The evidence at trial was that identical amendments were made to the other trust agreements, including the Clean-Up Trust Agreement.

Alternatively, Defendants argue that the amendments to the trust agreements were not effective until August 18, 1981.[7] Prior to June 9, 1981, the trust agreements establishing the various trust funds provided for a seven percent rate of interest on delinquent contributions beginning with the date on which such contributions were due and continuing at that rate until paid. These trust agreements were amended effective June 9, 1981. Under the amended agreements, interest also accrues from the date the contributions become due and continues at the same rate until paid, but the rate of interest is to be determined by the discount rate of the Federal Reserve Board prevailing on the 25th of the month preceding the month in which the delinquent contributions became due plus five percent.

As we interpret the amendment, it did not affect the rate of interest on contributions which became delinquent prior to the effective date of the amendment, June 9, 1981. As to these delinquencies, interest continues to run at the seven percent rate

which was effective when the contributions originally became due. Because the district court applied the interest rate determined under the amended agreements to all delinquencies regardless of when they originally became due, it erred as to jobs for which contributions became due prior to June 9, 1981.[8]

## C. Adequacy of Corporate Shield

■ The district court's finding that the corporate shields of Uriarte Clean-Up and Developers were inadequate to protect their shareholders from personal liability for the unpaid contributions of Uriarte Clean-Up is subject to review under the clearly erroneous standard. *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1113 (9th Cir.1979). In considering whether to disregard the corporate form, we apply federal substantive law, although we may look to state law for guidance. *Id.* at 1109.

The district court relied on two theories to pierce the corporate veil. The first is based on the district court's conclusion that Uriarte Clean-Up is a fragment of a larger enterprise which includes Developers. The second is based on the district court's conclusion that Uriarte Clean-Up is a dummy for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends.[9] On appeal,

all or any part of any sums due the Fund as interest and liquidated damages.

7. This court has no idea of the defendants' source for this date. What the parties call Amendment 12 clearly states that it is effective June 9, 1981.

8. Interest was *improperly computed on the following job numbers:* 1696, 1697, 1699, 1710, 1745, 1746, 1748, 1764, 1765, 1778, 1779, 1784, 1787, 1790, 1791, 12202, 35612, 30428, 10492, 35930 and 27770. The portion of the delinquencies on these jobs which became due prior to the effective date of the amendments should have been calculated at the seven percent rate.

9. For purposes of analyzing whether the shareholders should be held liable for the liabilities of the combined enterprise, we focus solely on

the adequacy of the Uriarte Clean-Up's corporate shield because the district court found that Developers has no separate existence apart from that of Uriarte Clean-Up. The district court's findings indicate that the key personnel of Developers have been substantially the same as those of Uriarte Clean-Up. The employees of Developers are also the employees of Uriarte Clean-Up. Developers uses Uriarte Clean-Up's equipment and operates out of Uriarte Clean-Up's office for which Uriarte Clean-Up does not charge Developers. The two corporations use the same telephone lines, the same bank, the same accountants and lawyers, and have substantially the same customers. Although Developer's capitalization is stated to be $1,000, no funds were ever actually transferred to it.

Uriarte Clean-Up does not appear to contest the finding that it and Developers comprise a single enterprise. That finding permits the liabilities of Developers to be attributed to Uriarte Clean-Up and vice versa. However, the stockholders cannot be held personally liable for the liabilities of the two corporations simply because they are engaged in a single enterprise. *Walkovszky v. Carlton,* 18 N.Y.2d 414, 276 N.Y.S.2d 585, 589, 223 N.E.2d 6, 9 (1966).

To determine whether stockholders are personally liable for the debts of their corporations, this court relies on three factors: the amount of respect given to the separate identity of the corporation by its shareholders, the fraudulent intent of the incorporators, and the degree of injustice visited on the litigants by recognition of the corporate entity. *Seymour,* 605 F.2d at 1111. As to the first prong, there was evidence from which the district court could conclude that Uriarte Clean-Up never issued stock and that adequate records were not kept.[10] Moreover, there is evidence that the shareholders periodically made interest-free loans to the corporation for which no promissory notes or IOU's were given.

More important, the evidence is sufficient for the district court to conclude that Uriarte Clean-Up owned less than an adequate amount of assets to carry on its business. Although defendants contend that partnership assets were transferred to the corporation, the evidence is inadequate as to what those assets consisted of and what their value was. For example, defendants contended that accounts receivable valued at $70,000 were transferred[11] but were unable to provide us with the value of the accounts payable that were also transferred. Although several trucks, most of which were encumbered, were also allegedly transferred, defendants could provide no evidence of their equity value. Even more damaging to defendant's position is the absence of any evidence to support the suggestion that any cash was ever transferred. In fact, the evidence is to the contrary. Roland Uriarte stated that the corporation paid its operating expenses out of cash flow. Also, there was evidence that the shareholders periodically had to advance money to the corporation in order to meet its payroll.

Under prong two, we find evidence of fraudulent intent in the failure of the incorporators adequately to capitalize the corporation at its inception.[12] Adequate capitalization means "capital reasonably regarded as adequate to enable [the corporation] to operate its business and pay its debts as they mature." N. Lattin, *Lattin on Corporations* § 15(a) at 77 (2d ed. 1971) (quoting *Ohio Edison Co. v. Warner Coal Corp.,* 79 Ohio App. 437, 72 N.E.2d 487 (Ct.App.1946)). Although Uriarte Clean-Up may have had some meager nonliquid assets at its inception, the failure to infuse it with any working capital in the form of cash or other liquid assets rendered its initial capitalization inadequate. *See Seymour,* 605 F.2d at 1113 n. 11.

The third prong of the test requires a finding that failure to pierce the corporate

---

10. Uriarte Clean-Up failed to appear at a deposition which had been noticed and at which Uriarte Clean-Up was supposed to bring its records. Apparently, as a sanction for its nonappearance, Uriarte Clean-Up was barred at trial from proving that these records existed.

11. Although defendants value the partnership's accounts receivable at $70,000, we note that they did not discount this figure to take account of the time value of money or the contingency that some of the receivables might not be collected. Generally accepted accounting practice requires that a bad debt reserve be set up to

account for contingencies that not all receivables will be collected. No balance sheet for Uriarte Clean-Up was offered into evidence, but we can surmise that no such account was ever set up. Thus, the actual value of the receivables at the time of the alleged transfer cannot be determined.

12. Fraudulent intent cannot be established by the fact that Uriarte Clean-Up filed fraudulent reports to the Clean-Up Trust. *See Seymour,* 605 F.2d at 1113. There must be fraudulent intent in the forming of the corporation. *Id.*

veil would produce an inequitable result.[13] Courts have found this prong satisfied when "a corporation is so undercapitalized that it is unable to meet debts that may reasonably be expected to arise in the normal course of business." Note, *Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law,* 95 Harv.L.Rev. 853, 855 (1982). One of the reasons for the failure of Uriarte Clean-Up to make its trust fund contributions is that it lacked either the income or the capital to meet these obligations. Moreover, these obligations could reasonably be expected to arise in the normal course of Uriarte Clean-Up's business. This is not a case where the corporation was once adequately capitalized but subsequently fell upon bad financial times. Consequently, the district court could quite properly find that injustice would result if it were to respect the corporate form.

## D. Attorneys' Fees

The district court awarded plaintiff attorneys' fees of $123,948.75, representing 1180.75 hours of legal services billed at $85–$125 per hour. In fixing attorneys' fees, the district court is required to consider the twelve factors enumerated in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). The failure to follow these guidelines constitutes an abuse of discretion. *Seymour,* 605 F.2d at 1117. The award in this case does not appear to be within the range of awards in similar cases. *See, e.g., id.* at 1116–17 ($10,000 awarded); *Central States, Southeast & Southwest Areas Pension v. C.J. Rogers Transportation Co.,* 544 F.Supp. 308, 315 (E.D.Mich.1982) ($40,-640 awarded); *Ford v. New York Central Teamsters Pensions Fund,* 506 F.Supp. 180, 183 (W.D.N.Y.1980) ($18,730 awarded), *aff'd,* 642 F.2d 664 (2d Cir.1981) (per cu-

riam); *Huge v. Reid,* 468 F.Supp. 1024, 1028 (N.D.Ala.1979) ($2636.41 awarded), *aff'd,* 615 F.2d 916 (5th Cir.1980). Moreover, we find no indication in the record that the district court considered the twelve factors of *Kerr* in fixing the attorneys' fee award. Therefore, we remand the award of attorneys' fees to the district court for consideration of the factors enumerated in *Kerr.*[14]

## III

That part of the judgment concerning prejudgment interest and attorneys' fees is vacated, and the case is remanded to the district court for further proceedings not inconsistent with this opinion. The parties shall bear their own costs on this appeal.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

**13.** The fact that Uriarte Clean-Up is insolvent does not of itself constitute an inequitable result. *Seymour,* 605 F.2d at 1113.

**14.** Clean-Up Trust also requests its attorneys' fees on this appeal. It bases its request on the fact that this appeal by Uriarte Clean-Up is frivo-

lous. Because Uriarte Clean-Up has established that an improper interest rate was applied, its appeal cannot be considered frivolous. Consequently, Clean-Up Trust is not entitled to fees under Fed.R.App.P. 38.