**BOARD OF TRUSTEES OF THE HOTEL AND RESTAURANT EMPLOYEES LOCAL 25 and Employers' Health and Welfare Fund, et al., Appellants,**

v.

**JPR, INC., Appellee.**

**No. 97–7040.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 18, 1997.

Decided Feb. 27, 1998.

Rehearing Denied April 27, 1998.

Daniel M. Katz, Washington, DC, argued the cause and filed the briefs for appellants. Ellen G. Ranzman, Washington, DC, entered an appearance.

Malcolm L. Pritzker, Washington, DC, argued the cause and filed the brief for appellee. Steven R. Semler, Washington, DC, entered an appearance.

Before: EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge RANDOLPH.

WALD, Circuit Judge:

This appeal is brought by the Boards of Trustees of two employee benefit plans, (1) the Hotel and Restaurant Employees Local 25 and Employers' Health and Welfare Fund, and (2) the Hotel and Restaurant Employees Local 25 and Hotel Association, Cafeteria and Other Subscribing Employers Group Legal Services Fund. (We will refer to the two plans as "the Funds," and to their Boards of Trustees collectively as "the Trustees.") The Trustees prevailed in an action in the district court in which they sought to collect underpayments to the Funds by JPR, Inc. ("JPR"), the entity that operates the Washington, D.C. restaurant La Colline. In addition to recovering the shortfall in payments, they collected interest, liquidated damages, litigation expenses, and attorney's fees. The district court declined, however, to award the Trustees auditing fees, and awarded attorney's fees only at the rate actually charged, rather than at market rates. The Trustees appeal these two rulings. We affirm the first, but reverse the second, finding that the district court must consider whether the fees charged by the Trustees' attorney incorporated a public-spirited discount, and, if so, award fees at market rates.

## I. BACKGROUND

The Funds were established by agreement between Local 25 of the Hotel & Restaurant Employees Union ("the Union") and the Hotel Association of Washington, D.C. (the "Hotel Association"); the Trustees who administer the Funds are drawn from representatives of both parties. The Union represents a bargaining unit of employees of La Colline, and JPR is a member of the Hotel Association. The collective bargaining agreement between the Union and JPR requires JPR to make a specified contribution to the Funds for every hour worked by an employee.

The documents establishing the Funds are called the "Dental and Optical Care Plan Trust Agreement"[1] and the "Group Legal Services Plan Trust Agreement." Each of these agreements requires participating employers to make contributions to the appropriate Fund, and permits the Trustees of that Fund to audit employers' records in order to ensure that the correct contributions have been made. The Trustees periodically conduct routine audits of participating employers to assure that they are making the appropriate contributions.

This case arises out of such a routine audit, that of JPR's contributions to the Funds from 1992 to 1994. The audit revealed a total shortfall of $36,162.88. The Trustees attempted to persuade JPR to pay this sum voluntarily, and then filed suit to compel JPR to do so, bringing claims under the Employee Retirement Income Security Act ("ERISA") and the National Labor Relations Act. JPR raised three affirmative defenses: first, that no payments were due for employees in their first three months of employment; second, that some of the employees were covered by other insurance and that no contributions were needed on their behalf; and third, (in a variation of the second argument) that it need not make contributions for dental insurance which it asserted was duplicative. The Trustees moved for summary judgment, and the district court granted the motion, finding none of JPR's defenses to be meritorious. JPR did not appeal this ruling.

ERISA provides that "in any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan" an enumerated list of elements of damages. 29 U.S.C. § 1132(g)(2) (1994). The Trustees' action was within this section, as it was brought, *inter alia*, to enforce 29 U.S.C. § 1145, a provision that relates to delinquent contributions.[2] Accordingly, in addition to

---

1. The title of this agreement reflects the former name of the Health and Welfare Fund.

2. Section 1145 provides: "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement

recovering the overdue amount, the Trustees sought, and the district court awarded, (1) interest (at 18%), (2) duplicate interest in lieu of liquidated damages, (3) litigation expenses, and (4) attorney's fees.

The district court declined, however, to award $9,066 in audit fees sought by the Trustees. The Trustees also argued that the amount of attorney's fees charged by their counsel, $17,775, reflected a large charitable discount from market rates, and that they should receive an award at the market value of their counsel's legal services, which they claimed was $43,068.75. The district court did not accept this argument, and awarded only the actual amount of fees charged. These two decisions are now before us on appeal.

## II. ANALYSIS

■ We have often been warned that "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Clearly, the district court is most familiar with the interstices of the litigation, and we accord its decisions considerable deference. *See id.* at 437, 103 S.Ct. at 1941. Our review of its fee awards is confined to correcting errors of law and remedying abuses of discretion. *See Covington v. District of Columbia*, 57 F.3d 1101, 1110 (D.C.Cir.1995); *see also Pierce v. Underwood*, 487 U.S. 552, 571, 108 S.Ct. 2541, 2553, 101 L.Ed.2d 490 (1988) (stating that "it is well established that the abuse-of-discretion standard applies" to review of a district court's award of fees).

### A. *Audit Fees*

The Trustees sought two types of audit fees in the district court: (1) the costs of the routine audit that discovered JPR's shortfall in payments, and (2) fees for 24 hours of work performed in connection with the merits of the delinquency litigation before the district court. The district court denied both categories of audit fee, for reasons that we conclude were correct.

shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agree-

### 1. *Costs of the Routine Audit*

The Trust Agreement establishing the Health and Welfare Fund contains a provision entitled "Default and Payment" which provides that, in the event of "failure to pay such monthly contributions in full within the time above provided,"

any person in default may be required at the discretion of the Trustees to pay as liquidated damages such amounts as the Trustees may determine, including interest up to the maximum permitted by law, together with all expenses of collection incurred by the Trustees, including, but not limited to reasonable counsel fees, auditing fees, and court costs, and any other lawful charges for late payment as the Trustees may determine.

The Trust Agreement establishing the Legal Services Fund contains a provision that is, for our purposes, identical (it contains minor differences of wording). Because the two provisions are equivalent, we will refer to them together as "the" Default and Payment Clause.

■ ERISA requires that "[e]very employer who is obliged to make contributions to a multiemployer plan ... make such contributions in accordance with the terms and conditions of such plan ...," 29 U.S.C. § 1145 (1994), and permits Plan fiduciaries to bring suit to "enforce ... the terms of the plan." 29 U.S.C. § 1132(a)(3) (1994). Thus, if the Default and Payment Clause requires employers who are in default to pay routine auditing fees, ERISA empowers the Trustees to enforce that requirement. *See Iron Workers District Council v. Hudson Steel Fabricators & Erectors, Inc.*, 68 F.3d 1502, 1507 (2d Cir.1995). The district court concluded that the Default and Payment Clause did not include such a requirement, and hence declined to award routine auditing fees.

■ We review questions of the proper interpretation of ERISA plans *de novo*. *See Carey Canada, Inc. v. Columbia Cas. Co.*, 940 F.2d 1548, 1554 (D.C.Cir.1991). The

ment." 29 U.S.C. § 1145 (1994). The Funds are multiemployer plans.

Trustees point to the Default and Payment Clause's statement that they may collect "all expenses of collection incurred by the Trustees, including, but not limited to reasonable counsel fees, auditing fees, and court costs," and argue that this allows them to collect all auditing fees, including the costs of the routine audit that discovered an underpayment. We do not think so. This passage only permits the Trustees to recoup those "auditing fees" that qualify as "expenses of collection." An "expense of collection," as that phrase is usually understood, is an expense that results from collection efforts. The Trustees have pointed to no evidence that this phrase means something different here. The fact that the Default and Payment Clause also lists "reasonable counsel fees" and "court costs" as types of "expenses of collection" confirms our reading; both are costs that are only incurred as a result of collection efforts. (This is an application of *ejusdem generis,* the canon of construction that states that "a general statutory term should be understood in light of the specific terms that surround it." *Hughey v. United States,* 495 U.S. 411, 419, 110 S.Ct. 1979, 1984, 109 L.Ed.2d 408 (1990).)

This is not to say that auditing fees may never qualify as "expenses of collection." Fees for non-routine follow-up audits performed as a part of the collection process are clearly included in the term. An audit that began as routine might also abruptly change its stripes and become a non-routine audit, if auditors discovered inconsistencies during their work and did extra work to untangle them. Because such detective work would be motivated by the desire to collect an underpayment, rather than by the need to perform a routine audit, it could fairly be called an "expense of collection." There is

no allegation of this kind here, however; the Trustees' audit of JPR seems to have cost no more than would a routine audit of any other employer.[3]

The Fifth Circuit has construed a similar plan provision—which also allowed the Trustees to recover all "expenses of collection"—to allow reimbursement of routine audit fees. *See Carpenters Amended and Restated Health Benefit Fund v. Ryan Const. Co.,* 767 F.2d 1170, 1175 (5th Cir.1985). *Ryan* found that the costs of the routine audit were "expenses of collection" because an audit is "a necessary first step in collection of any delinquency." *Id.* at 1175–76. We believe the reasoning of *Ryan* proves too much. By *Ryan*'s logic, the Trustees should also be able to put in for a host of other expenses that are "necessary" to the initiation of collection efforts, *i.e.,* the cost of their own salaries, as collection efforts are impossible without effective supervision of the auditors and of the Funds' finances. The test is not whether an expenditure is a necessary precondition to collection efforts, but rather the reverse, whether collection efforts prompted the expenditure.[4]

### 2. Litigation–Related Auditing Expenses

The district court declined to grant the Trustees' request for reimbursement for 24 hours of litigation-related auditing expenses, finding that the hours spent were "more in the nature of litigation support than audit services, ... and in any event are inadequately supported." We find that the district court was within its discretion in concluding that this request for reimbursement was inadequately supported. We therefore do not consider whether litigation support services are compensable under section 1132(g)(2). *But cf. Missouri v. Jenkins,*

3. The Trustees argue that JPR's unusual recordkeeping practices increased the costs of the routine audit. But there is no indication that JPR adopted its recordkeeping practices in order to conceal underpayments, or that there is any other link between those practices and JPR's underpayment.

4. The Default and Payment Clause also states that "any person in default may be required at the discretion of the Trustees to pay as liquidated damages such amounts as the Trustees may determine...." The Trustees have not argued that

this language entitles them to recover routine audit fees, and we therefore have not considered that question. Nor have the Trustees claimed that they should have received audit fees under ERISA's provision permitting the court to award "such other legal or equitable relief as the court deems appropriate." 29 U.S.C. § 1132(g)(2)(E); *see also Operating Engineers Pension Trust v. A–C Co.,* 859 F.2d 1336, 1342–43 (9th Cir.1988) (finding that audit fees may be awarded under this provision).

491 U.S. 274, 285, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989) (finding that an award of a "reasonable attorney's fee" under 42 U.S.C. § 1988 may include the services of paralegals).

A plaintiff seeking attorney's fees under section 1983 must demonstrate that the hours billed were reasonably expended in pursuit of the litigation. "Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40. "[I]f the district court finds that the attorney failed to exercise billing discretion with respect to any of the hours [claimed], the court may reject those hours as not reasonably expended." *Goos v. National Association of Realtors,* 68 F.3d 1380, 1387 (D.C.Cir.1995). The weaker the apparent need for a particular activity, the higher the evidentiary hurdle a claimant must cross in order to demonstrate that it was in fact performed in a reasonable effort to pursue the litigation.

The Trustees have failed to meet this standard of reasonableness. Sixteen hours of the twenty-four were consumed in preparing for the Trustees' summary judgment motion, mostly on two declarations. The Trustees have not attempted to provide us with any explanation of the need for these declarations, and their purpose is not obvious, given that the results of the audit appear not to have been in controversy. The remaining eight hours were used to compile two tables, one calculating the interest due on JPR's underpayments, and the other listing the hours of work performed by particular auditors and their hourly rates. Although the purpose of these tables is more clear, it is incomprehensible that their preparation could have consumed anywhere near eight

hours. The appropriate course in such circumstances is often to allow a part of the requested time. Here, however, the allowable amount of time—perhaps two hours—would be *de minimus,* especially when considered in relation to the Trustees' fee request as a whole. Accordingly, we see no need to disturb the district court's decision to disallow this claim altogether.

### B. *Attorney's Fees*

The Trustees argued before the district court that their attorney's hourly rate had been substantially discounted for public-spirited reasons, and that they were therefore entitled to an award of fees based on the market value of the services he performed, not on the amount that he actually charged. They asserted that the market value of their attorney's services is $43,068.75, and sought an award in that amount. The Trustees' attorney said at oral argument that the Funds would remit to him any amount awarded in excess of his actual fees.[5]

The district court concluded that, despite some authority permitting plaintiffs to recover fees at market rates even if they actually paid their counsel lesser amounts, *see, e.g., Covington,* 57 F.3d at 1107, such an exception is limited to awards of fees under 42 U.S.C. § 1988 (the governing statute in *Covington*), and does not apply to this case. Accordingly, the district court awarded only the amount actually charged by the Trustees' attorney, $17,775.

We begin by assuming that the Trustees' attorney, for public-spirited reasons, provided his services to the Trustees at a discount. Assuming this to be the case, we find the Trustees entitled to a fee award at the market value of their services, rather than at the actual rate they were charged. We then discuss how the district court is to decide whether the fee charged did in fact incorporate a public-spirited discount, and, if so, how

---

5. We therefore need not consider the potential applicability of *National Treasury Employees Union v. United States Department of the Treasury,* 656 F.2d 848 (D.C.Cir.1981), which found, citing the restrictions on fee-splitting in the ABA's Code of Professional Responsibility, that it was impermissible to make an award of attorney's fees to a union in excess of the actual cost to the union of

the attorney's services. *See id.* at 851–53; *but cf.* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 93–374 (1993) (interpreting Model Rule of Professional Conduct 5.4 to permit the sharing of court-awarded fees for a pro bono representation between an attorney and a nonprofit client).

it should determine the market rate in making the award in this case.

### 1. Market Rate or Actual Rate?

■ ERISA provides that, in actions to collect unpaid contributions in which the plan is successful, the court "shall award to the plan ... (D) reasonable attorney's fees and costs of the action, to be paid by the defendant." 29 U.S.C. § 1132(g)(2). The usual method of calculating reasonable attorney's fees is to multiply the hours reasonably expended in the litigation by a reasonable hourly fee, producing the "lodestar" amount. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564, 106 S.Ct. 3088, 3097–98, 92 L.Ed.2d 439 (1986) (*"Delaware Valley"*). This amount may then be adjusted by a multiplier "in certain 'rare' and 'exceptional' cases," *see id.* at 565, 106 S.Ct. at 3098 (quoting *Blum v. Stenson,* 465 U.S. 886, 898–901, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984)), although there is a "strong presumption that the lodestar figure ... represents a 'reasonable' fee." *Id.*

■ The issue we are concerned with here is what constitutes a "reasonable hourly fee" for purposes of the lodestar calculation. This court held in *Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516 (D.C.Cir.1988) (in banc) (*"SOCM "*), and reaffirmed in *Covington,* 57 F.3d at 1107, that a party whose attorney charges a discounted rate for public-spirited reasons may nevertheless receive an award of fees at market rates. The rationale of those cases is not, as the district court concluded, limited to actions under section 1988; indeed, although *SOCM* drew extensively on the legislative history of section 1988, *SOCM* itself involved an award under a fee-shifting provision of the Surface Mining Control and Reclamation Act. *SOCM* applied section 1988 jurisprudence to the interpretation of this statute on the authority of *Delaware Valley,* in which the Supreme Court found that it was appropriate to apply section 1988 caselaw in construing a fee-shifting provision of the Clean Air Act because both provisions had as their "common purpose" to "promote citizen enforcement of important federal policies." 478 U.S. at 560, 106 S.Ct. at 3096; *see also*

*SOCM,* 857 F.2d at 1519 n. 1 (citing the panel opinion in that case, *Save Our Cumberland Mountains, Inc. v. Hodel,* 826 F.2d 43, 47 (D.C.Cir.1987), which in turn cited this passage of *Delaware Valley* ).

*Delaware Valley* thus endorses the application of law developed under section 1988 to other fee-shifting provisions that have the same citizen-enforcement purpose. Since *Delaware Valley,* the Court has twice clarified when it is appropriate to apply caselaw developed under one fee-shifting provision to another such provision. First, in *Independent Federation of Flight Attendants v. Zipes,* 491 U.S. 754, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989), the Court observed that "fee-shifting statutes' similar language is a strong indication that they are to be interpreted alike," and drew on caselaw under one fee-shifting provision of the Civil Rights Act of 1964 in interpreting another fee-shifting provision of the same statute. *Id.* at 758 n. 2, 109 S.Ct. at 2735 n. 2.

Conversely, in *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), the Court found that the "normal indication" of *Zipes* could be "overborne" if the factors that justify a fee-shifting rule in one context, such as the purpose or legislative history of a statute, are absent in another. *Id.* at 523, 114 S.Ct. at 1027–28. *Fogerty* involved the interpretation of 17 U.S.C. § 505, a fee-shifting statute applicable to copyright infringement actions. The wording of this provision is virtually identical to that of a fee-shifting provision for Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k). Under caselaw interpreting section 2000e–5(k), there is a presumption that prevailing plaintiffs—but not prevailing defendants—will receive an award of fees. *See Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 418, 98 S.Ct. 694, 698–99, 54 L.Ed.2d 648 (1978). But the *Fogerty* Court found that it was not appropriate to apply the section 2000e–5(k) presumption to section 505, despite the similarity of language between the two provisions, because there was no indication in section 505's legislative history that Congress intended plaintiffs and defendants to be treated differently for purposes of fee awards. The Court also con-

cluded that the purpose of the Copyright Act—encouraging the production of creative works—is not obviously served by favoring plaintiffs over defendants in copyright infringement actions, especially given that "corporate behemoths" and "starving artists" are to be found among both the plaintiffs and the defendants in infringement actions. 510 U.S. at 524, 114 S.Ct. at 1028 (citation omitted).

■ The inquiry prescribed by *Zipes, Fogerty* and *Delaware Valley* does not differ that much from our usual processes of statutory interpretation. The first step, of course, is to consult the text of the statute; thus, *Zipes'*s rule that "fee-shifting statutes' similar language is a strong indication that they are to be interpreted alike," 491 U.S. at 758 n. 2, 109 S.Ct. at 2735 n. 2. The next step is to consider the statute's purpose, structure, and legislative history; this explains *Fogerty*'s rule that the "normal indication" of *Zipes* can in some circumstances be "overborne" on the basis of contextual evidence. 510 U.S. at 523, 114 S.Ct. at 1027–28. *Delaware Valley* comes into play at this stage; it defines one category of statutes—those intended to "promote citizen enforcement of important federal policies," 478 U.S. at 560, 106 S.Ct. at 3096—as having a "common purpose" and therefore presumptively to be interpreted similarly. *See Lyle v. Food Lion, Inc.,* 954 F.2d 984, 988 n. 1 (4th Cir. 1992) (citing *Delaware Valley* in applying section 1988 caselaw to a fee-shifting provision of the Fair Labor Standards Act).[6]

Should our case fit securely within *Delaware Valley,* our analysis would be at an end, as *SOCM* would apply directly. But, alas, it is not that easy. Section 1132(g)(2) is not intended to promote enforcement of important federal policies by "citizens," because recoveries under section 1132(g)(2) are limited to plan fiduciaries, *see* 29 U.S.C. § 1132(g)(2) ("In any action under this sub-

chapter *by a fiduciary for or on behalf of a plan . . .*") (emphasis added), a group that at first glance seems less in need of favorable fee-shifting rules than the citizenry at large.

That section 1132(g)(2) does not fit squarely within the four corners of *Delaware Valley* does not necessarily foreclose the application of *SOCM;* it does, however, require that we consider the specific text and purposes of section 1132(g)(2) to decide whether *SOCM*'s market-rate standard applies. We turn to *Zipes* and *Fogerty* for guidance. As in *Zipes,* the text of section 1132(g)(2) does parallel that of section 1988; both provide for a "reasonable" fee. Next, as *Fogerty* commands, we turn to the statute's purposes and legislative history to see whether the presumption that section 1132(g)(2) is to be interpreted in line with section 1988 is "overborne" by contrary evidence.

Section 1132(g)(2) was enacted as part of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). In enacting the MPPAA, Congress was responding to an increase in the financial instability of multiemployer pension plans, a problem it believed would continue to escalate unless action was taken. H.R.REP. No. 96–869, pt. 1 at 52–57 (1980) ("House Report"). The MPPAA put into place a number of measures intended to "protect retirees and workers who are participants in [multiemployer pension] plans against the loss of their pensions," *id.* at 51, including provisions that altered the funding requirements for multiemployer plans, required withdrawing employers to contribute to a plan's unfunded obligations, and adjusted the insurance provided by the Pension Benefit Guaranty Corporation. *See id.* at 65–70; *see also Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Company,* 513 U.S. 414, 415–17, 115 S.Ct. 981, 985, 130 L.Ed.2d 932 (1995) (reviewing Congress's goals in enacting the MPPAA).

---

**6.** *Delaware Valley*'s suggestion that a broad group of fee-shifting provisions should all be subject to the same set of legal standards may also have been based on the assumption that this would limit parties' incentives to litigate fee disputes. *Cf. Hensley v. Eckerhart,* 461 U.S. 424, 455, 103 S.Ct. 1933, 1951, 76 L.Ed.2d 40 (1983) (Brennan, J., concurring in part and dissenting in part) (comparing appellate litigation of fee disputes to "a Frankenstein's monster" that "meanders its well-intentioned way through the legal landscape leaving waste and confusion (not to mention circuit splits) in its wake"). In this respect, then, the interpretation of fee-shifting statutes may differ from the usual practice of statutory interpretation.

Although most of the provisions of the MPPAA as enacted tracked the bill that originated in the House of Representatives, H.R. 3094, the language of section 1132(g)(2) originated in the Senate bill, S. 1076. The following passage explains the Senate's under-standing of the meaning of its language:

Delinquencies of employers in making required contributions are a serious problem for most multiemployer plans. Failure of employers to make promised contributions in a timely fashion imposes a variety of costs on plans. While contributions remain unpaid, the plan loses the benefit of investment income that could have been earned if the past due amounts had been received and invested on time. Moreover, additional administrative costs are incurred in detecting and collecting delinquencies. Attorneys fees and other legal costs arise in connection with collection efforts.

These costs detract from the ability of plans to formulate or meet funding standards and adversely affect the financial health of plans. Participants and beneficiaries of plans as well as employers who honor their obligation to contribute in a timely fashion bear the heavy cost of delinquencies in the form of lower benefits and higher contribution rates. Moreover, in the context of this legislation, uncollected delinquencies can add to the unfunded liability of the plan and thereby increase the potential withdrawal liability for all employers.

Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously. Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises.

The public policy of this legislation to foster the preservation of the private multiemployer plan system mandates that provision be made to discourage delinquencies and simplify delinquency collection. The bill imposes a Federal statutory duty to contribute on employers that are already contractually obligated to make contributions to multiemployer plans. A plan sponsor that prevails in any action to collect delinquent contributions will be entitled to recover the delinquent contributions, court costs, attorney's fees, and double interest on the contributions owed. The intent of this section is to promote the prompt payment of contributions and assist plans in recovering the costs incurred in connection with delinquencies.

STAFF OF SENATE COMMITTEE ON LABOR AND HUMAN RESOURCES, 96TH CONG., 2D SESS., S. 1076: THE MULTIEMPLOYER PENSION PLAN AMENDMENTS ACT OF 1980: SUMMARY AND ANALYSIS OF CONSIDERATION, at 43–44 (Comm. Print 1980) (hereinafter "Senate Committee Print").[7] In the debates surrounding the enactment of the final version of the MPPAA, Representative Thompson, one of the sponsors of H.R. 3094, repeated this passage essentially verbatim on the floor of the House. 125 CONG. REC. 23,038, 23,039 (1980).

We draw three lessons from section 1132(g)(2)'s text, purposes, and legislative history.[8] First, in enacting section

---

**7.** The district court in *Central States, Southeast and Southwest Areas Pension Fund v. Alco Express Co.*, 522 F.Supp. 919, 927–28 (E.D.Mich. 1981) (*"Central States"*), in the course of a detailed review of the legislative history of section 1132(g)(2), explained that "[b]ecause S. 1076 was also referred to the Senate Committee on Finance there was no formal committee report, since Senate Rule XXVII requires a joint report under such circumstances." 522 F.Supp. at 928 n.11.

**8.** The above-quoted legislative history of section 1132(g)(2) refers in places to "pension plans," presumably because most of the MPPAA related only to pension plans, not to welfare benefit plans, the other type of employee benefit plan covered by ERISA. *See 29 U.S.C. § 1002(3).* The Funds are both welfare benefit plans. Congress clearly signalled, however, that section 1132(g)(2) be interpreted in the same way whether welfare or pension plans were involved. The text of section 1132(g)(2) as enacted is equally

1132(g)(2), Congress had a strong goal of "discourag[ing] delinquencies" and rendering delinquency collection less "cumbersome and costly." Senate Committee Print, at 44. Deterring parties from prolonging litigation is an important goal of most fee-shifting provisions. Here, however, Congress's desire to achieve this goal was especially strong. Section 1132(g)(2) provides that the courts "shall" award fees to fiduciaries when judgments are awarded in their favor in delinquent-contribution actions. It makes no provision for prevailing defendants.[9]

In statutes protecting economic interests, mandatory fee-shifting is uncommon, and the same standards are usually applied to fee awards to both plaintiffs and defendants. *See, e.g., Fogerty,* 510 U.S. at 534, 114 S.Ct. at 1033 (concluding that fee-shifting under the Copyright Act is discretionary, and that the same standard should be applied in considering fee awards to both parties); *id.* at 525 n. 12, 114 S.Ct. at 1028 n. 12 (indicating that "courts have generally awarded attorney's fees in an evenhanded manner based on the same criteria" under the trademark and patent laws); *Eddy v. Colonial Life Ins. Co. of America,* 59 F.3d 201, 205 (D.C.Cir.1995) ("In general, statutes protecting economic interests that contain fee-shifting provisions vesting discretion in the district court do not create a presumption that a prevailing party will be awarded fees."). Congress's express *requirement* that the courts award fees to fiduciaries who win delinquent-contribution actions demonstrates an unusually powerful intent to deter excessive litigation by defendants. A rule that requires employers to pay the market rate in cases in which an attorney has discounted her fees for public-

spirited reasons surely serves this goal better than does one under which only fees actually paid out are recoverable. If a plan receives legal services from its attorneys for free, then the actual-cost rule would require the delinquent employer to pay nothing—a result clearly inconsistent both with Congress's desire to deter employers from late payment and with the statute's requirement that the court "shall" award "reasonable attorney's fees." Likewise, the fact that a plan receives its legal services at a deep discount should not justify a similar discount of section 1132(g)(2)'s deterrent effect.[10]

A second important goal of fee-shifting provisions is to enable parties to hire "competent counsel" to pursue their cases. *SOCM,* 857 F.2d at 1521 (emphasis omitted) (citing section 1988's legislative history); *see also Kay v. Ehrler,* 499 U.S. 432, 436 & n. 8, 111 S.Ct. 1435, 1437 & n. 8, 113 L.Ed.2d 486 (1991). Although this goal is not explicitly stated in the legislative history of section 1132(g)(2), Congress did express a strong desire to "simplify delinquency collection" and "assist plans in recovering the costs incurred in connection with delinquencies," Senate Committee Print, at 44, goals that are best served if plan fiduciaries are able to hire competent counsel. Again, a fee-shifting rule that requires delinquent employers to pay market rates serves this purpose better than does one under which they pay only the billed rate.[11] In this case, the plan has agreed to pass on the entire amount of any fee award to its attorneys. Such an arrangement obviously improves the ability of plans to obtain high-quality legal representation in the first instance. Indeed, a plan that is near insolvency—as one of the plans at issue

applicable to both types of plans, as was the draft provision that was before the committee; much of the above-quoted legislative history is likewise equally applicable to both types of plans.

**9.** They must therefore invoke 29 U.S.C. § 1132(g)(1), which allows the court to make a fee award "in its discretion." *Id.*

**10.** Indeed, the plans that are closest to insolvency, and therefore need the deterrent effect of section 1132(g)(2) the most, would be most harmed by an actual-cost rule, as they are also the group that is likeliest to seek, and obtain, discounted legal services.

**11.** Our dissenting colleague says that we assume mistakenly that "expensive counsel necessarily equals competent counsel." Diss. op. at 2. We do not deny that there exist expensive, incompetent counsel; but there is ordinarily a correlation between an attorney's rates and her competence. The lodestar approach to setting legal fees is premised on the idea that there is a market for legal services, in which an attorney's hourly rate is correlated with her abilities. *SOCM* similarly assumed that market rate fees are needed to attract competent attorneys in complex cases. *See* 857 F.2d at 1521.

in this case, the Legal Services Plan, apparently was in early 1995[12]—might otherwise find it quite difficult to secure the assistance of competent legal counsel in returning it to stability. On this point, we note that Congress enacted the MPPAA in order to stabilize financially ailing ERISA plans, *see* House Report, at 52–57; Senate Committee Print, at 1, and intended section 1132(g)(2) to further that objective, *see* Senate Committee Print, at 44 (referring to "the public policy of this legislation to foster the preservation of the private multiemployer plan system").

Congress's preeminent purpose, in enacting section 1132(g)(2), to keep ERISA plans solvent also points us in the direction of reading section 1132(g)(2) in a way that facilitates, rather than impedes, private charitable donations to plans. If an attorney has made a public-spirited decision to charge a plan a discounted rate, a delinquent employer should not receive the benefit of this decision. Judge Easterbrook in the Seventh Circuit has endorsed this point:

> Some lawyers dedicate their professional lives to causes they find admirable and worthy of support—to legal services for the poor, to the representation of unions. These lawyers are making contributions to their favored causes, not in money, but in time.... Using opportunity cost as the measure of legal services means that the value of the lawyer's gift inures to the favored cause, and not to the adversary in litigation.

*Barrow v. Falck*, 977 F.2d 1100, 1105 (7th Cir.1992). In this case, of course, the Trustees' attorney would receive any fees in excess of the amount billed; but the Trustees would benefit indirectly from such an award (as the award would presumably make it easier for them to obtain competent counsel in the future), and JPR would not benefit at all.[13] This approach also accords with the Supreme Court's consistent rule that under fee-shifting statutes legal services are to be given their market value, irrespective of the contractual arrangements between attorney and client. *See Blanchard v. Bergeron*, 489 U.S. 87, 93, 109 S.Ct. 939, 944, 103 L.Ed.2d 67 (1989) ("Should a fee agreement provide less than a reasonable fee ..., the defendant should nevertheless be required to pay the higher [market-based] amount."); *Blum*, 465 U.S. at 893–96, 104 S.Ct. at 1545–48; *see also Central States, Southeast and Southwest Areas Pension Fund v. Central Cartage Co.*, 76 F.3d 114, 116 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 56, 136 L.Ed.2d 19 (1996) (citing this principle in reading section 1132(g)(2) to permit an award of attorney's fees at market rates to an organization represented by salaried staff counsel); *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir.1995).

JPR argues that the singular purpose of section 1132(g)(2) is to make plans whole, and that a fee award that exceeds the amount actually charged by a plan's attorneys is inconsistent with this purpose. Making plans whole is indeed one important purpose of section 1132(g)(2). *See* Senate Committee Print, at 44 (stating that the section's intent is to "assist plans in recovering the costs incurred in connection with delinquencies"). But, as we have established, section 1132(g)(2) has other, equally important goals, which are best served by a market-rate award. Furthermore, there is a real sense in which a market-rate award may be a peculiarly appropriate instrument by which to

---

12. In January, 1995, the Legal Services Fund's assets stood at $1,218. The Fund's present attorneys responded by adjusting their billing; they charged only when collection efforts were successful, and asked only their "regular hourly rate or a percentage of the amount actually collected, whichever was less."

13. Under the collateral-source rule, "[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." RESTATEMENT (SECOND) OF TORTS § 920A

(1979). This rule would seem to apply by analogy to in-kind donations of an attorney's services. Charitable contributions are ordinarily treated as a collateral source like any other, for precisely the reason identified by Judge Easterbrook, the desire to ensure that the benefit of the gift accrues to the donee, not to the tortfeasor. *See* 4 FOWLER V. HARPER ET AL, THE LAW OF TORTS § 25.22 at 661–63 (2d ed.1986); *see also Hudson v. Lazarus*, 217 F.2d 344, 346–47 (D.C.Cir.1954) (in a case under D.C. law, applying the collateral-source rule to free care received at a veterans' hospital).

make the Funds whole. An ERISA plan may have only a finite pool of discounted or free legal assistance available to it; once this pool is used up, the plan will then be required to pay higher rates for legal services. Compelling a plan to draw on its limited stock of discounted legal help thus has meaningful costs to the plan, and should be compensable.[14]

We also reject JPR's argument that this case is governed by *Eddy v. Colonial Life Ins. Co. of America*, 59 F.3d 201 (D.C.Cir. 1995). In *Eddy*, we interpreted a different ERISA fee-shifting provision, section 1132(g)(1). Under that provision, in any action under subchapter I of ERISA "by a participant, beneficiary, or fiduciary," a court may, "in its discretion," make an award of a "reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1) (1994). Subchapter I of ERISA can support a wide range of actions, including actions to enforce Plan terms or to recover benefits, suits for breach of fiduciary duty, actions to obtain information from plans, and equitable proceedings. *See* 29 U.S.C. §§ 1132(a), 1132(c). *Eddy* concluded that the presumption applied under civil-rights fee-shifting statutes that successful plaintiffs should receive an attorney's fee award should not apply to section 1132(g)(1). JPR points to *Eddy*'s observation that ERISA protects economic interests, while the civil rights statutes protect "dignitary as well as economic interests," 59 F.3d at 204, and claims that the same logic argues against applying *SOCM* to this case.

*Eddy* was a straightforward application of *Fogerty*'s command to consider the purposes of a fee-shifting statute in deciding whether to apply caselaw developed under another fee-shifting provision. *See Eddy*, 59 F.3d at 205 (citing *Fogerty*). ERISA's legislative history contained no evidence that Congress's goals in enacting section 1132(g)(1) would have been furthered by establishing a presumption in favor of awards to successful plaintiffs. *See id.* (This is no surprise, given

the smorgasbord of proceedings in which section 1132(g)(1) may be invoked.) In the absence of legislative history, *Eddy* considered the broad purposes of ERISA; it cited the civil rights laws as an example of a category of statute that *would* justify a presumption in favor of an award of fees, and contrasted the dignitary interests protected by the civil rights statutes with the economic interests furthered by ERISA. In this case, by contrast, the legislative history and specific purposes of section 1132(g)(2) both point towards allowing market-rate fee awards. We therefore need not, as we did in *Eddy*, resort to considering the general nature of ERISA as a statute protecting economic interests.

### 2. *Detecting Public–Spirited Discounts*

Having decided that the policies underlying section 1132(g)(2) support an allowance to the Trustees of fees at market rates, assuming the fees actually paid were discounted for public-spirited reasons, the task remains of deciding whether the fees paid did in fact reflect a public-spirited discount by the counsel. We leave this task initially for the district court, with a brief discussion of the guiding principles of law.

We explained in *Covington* that the fee applicant bears the burden of demonstrating that a fee incorporates a public-spirited discount:

> [T]he attorney must show that his or her custom of charging reduced rates is in fact attributable to "public spiritedness." Implicit in this line of inquiry is the assumption that the law was not written to subsidize attorneys who charge below-market rates because they cannot command anything more. And a defendant is free to rebut a fee claim on these terms in cases in which this issue is posed. We recognize that, in some cases, this may be a difficult line of inquiry, for an attorney who cannot command market rates invariably will have a "custom" of charging rates below the market. This problem is diminished with

---

14. For this reason, the dissent is mistaken in suggesting that we are offering a "windfall" to those plans that decide to keep the excess of a fee award over the amount billed. Diss. op. at 809. If only a limited amount of discounted legal help is available to a plan, then drawing on that pool of legal help has an opportunity cost to the plan. When the pool runs out, the plan will need the supposed "windfall" to pay its lawyers.

respect to attorneys who charge variable rates (both at and below the market, with the latter attributable to public-spirited goals).

*Covington*, 57 F.3d at 1108. We concluded that it was within the district court's "sound discretion" to determine whether an attorney had public-spirited reasons for charging reduced rates. *Id.*

██ Deciding whether an attorney has a public-spirited reason for a representation should not be all that difficult. An important part of this inquiry will focus on whether the fee charged in fact differs significantly from the market value of the attorney's services. We discuss the process of deciding the correct market rate for an attorney's services in the next section of this opinion; because the district court may find it easier to decide the market value of an attorney's work than to analyze her motivations, it may be appropriate to perform this analysis first.

██ Turning to the question of the attorney's motivations, we emphasize that it is only necessary for the attorney to show that public-spiritedness was a principal reason for the discount, and not that it was the *only* reason. It is rare to find a person who has only one reason for the things she does, and the presence of other motivations need not vitiate an attorney's public-spiritedness. Client development and attorney training, for instance, are accepted corollaries of pro bono representation. *See* Esther F. Lardent, *Structuring Law Firm Pro Bono Programs,* THE LAW FIRM AND THE PUBLIC GOOD 59, 72 (Robert A. Katzmann ed., 1995). Nor does the possibility of a fee award necessarily taint an attorney's motives. Such an award will only be forthcoming if the attorney wins, and will be no more than the amount the attorney could have obtained for her time on the free market. An attorney who was principally motivated by the desire to make money would not rely on such awards, but would seek out clients who were able to pay the full market rate, so that she could be assured of being paid at that rate whether she won or lost.

As officers of the court, attorneys will presumably not be inclined to misrepresent their reasons for granting a discount, and we assume that it will only rarely be necessary to second-guess those reasons. An affidavit from the client may also help to establish that the client understood that the fee it was being charged reflected a public-spirited discount, even if it may not have been expressly stated that this was the case. In some circumstances, however, there may be a clear explanation for a discount other than a desire to serve the public good (or market forces, which are taken into account in the market-rate inquiry). For instance, an attorney who gives a discount to a relative would need to make a strong showing that the discount was actually motivated by the public interest, and not by familial ties. We leave to the district court, in the first instance, the task of deciding the motivations of the Funds' attorneys.

### 3. *Determining the Market Rate*

██ As we explained in *Covington*, a party who avers that the rate charged by her attorneys incorporated a public-spirited discount must offer evidence as to the correct market rate for the attorneys' services. The party must both "offer evidence to demonstrate [her] attorneys' experience, skill, reputation, and the complexity of the case" and "produce data concerning the prevailing market rates in the relevant community for attorneys of reasonably comparable skill, experience, and reputation." 57 F.3d at 1108. In setting the market rate, the district court should consider what rate would be commensurate with the attorneys' skill and experience, and with the quality of the attorneys' work. To cite one of the dissent's examples, if a firm uses a case as a training-ground for young attorneys, the district court might find that the discounted rate charged by the firm reflected the attorneys' inexperience, and is the actual market value of the attorneys' services. Because the district court is most familiar with the quality of the attorneys' work, we will defer to its reasonable assessment of that work's market value.

Both the Trustees and JPR submitted evidence on prevailing market rates and on the skill and experience of the Funds' attorneys. Because the district court did not reach the question of the appropriate market rate, we will not discuss these two factors further;

*Covington* contains a detailed discussion of these questions. *See Covington,* 57 F.3d at 1108–10. We leave the issue of the prevailing market rate to the initial discretion of the district court.

## C. *Fees for This Appeal*

 Finally, the Trustees seek an award of the attorney's fees expended in prosecuting this appeal. As a rule, in fee disputes, if an award of attorney's fees is appropriate in the underlying litigation, such an award is also appropriate for a successful appeal (or defense of an appeal) of an issue relating to the fee award itself. This is so because, for fee-shifting provisions to serve their purposes (which may include, depending on the particular provision at issue, improving access to the courts, encouraging or discouraging certain types of litigation, or making litigants whole), their beneficiaries must be assured that they will be able to collect the fee awards that they are due. *See American Federation of Government Employees v. FLRA,* 994 F.2d 20, 22 (D.C.Cir. 1993) ("No matter what the purpose of an attorney's fee provision ... the availability of 'fees for fees' is essential to carrying out Congress's goal in including the provision in the first place."). This rule is fully applicable to fee awards under section 1132(g)(2). *See Building Service Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway,* 46 F.3d 1392, 1404 (6th Cir.1995) (finding that fees for successful appeals of attorney's fee disputes are recoverable under section 1132(g)(2)); *Operating Engineers Pension Trusts v. B & E Backhoe, Inc.,* 911 F.2d 1347, 1356 (9th Cir.1990) (same). The Trustees cannot be said to be successful in their appeal of the attorney's fee issue, however, until they establish on remand that their attorneys did indeed discount their fees for public-spirited reasons. *Cf. Hanrahan v.*

*Hampton,* 446 U.S. 754, 758–59, 100 S.Ct. 1987, 1989–90, 64 L.Ed.2d 670 (1980) (party is a "prevailing party" under section 1988 only by virtue of success on the merits, not success in obtaining remand on appeal); *Waterman Steamship Corp. v. Maritime Subsidy Board,* 901 F.2d 1119, 1122 (D.C.Cir. 1990) (in a fee-shifting case under the Equal Access to Justice Act, observing that "award of EAJA fees for corrective efforts that yield no real-world benefit would reduce the normal deterrent to litigative nit-picking").[15] If the Trustees do meet success on remand, the district court should make an additional award of fees reflecting those legal expenses the Trustees incurred in their appeal of the attorney's fees issue (but not that of the audit fees issue).

## III. CONCLUSION

We affirm the district court's conclusion that the Trustees were not entitled to audit fees. The language of the Default and Payment Clause cited by the Trustees does not cover the routine audit that is at issue in this case. As to the auditor's services in the litigation before the district court, we affirm the district court's conclusion that the Trustees failed to provide adequate documentation of the need for this work.

We conclude, however, that the district court was mistaken in finding that section 1132(g)(2) necessarily limits the Trustees to recovering their actual legal fees. If the Trustees can establish that their attorneys charged them a discounted rate for public-spirited reasons, they may recover a fee award at the market rate, rather than at actual cost. If the district court finds on remand that the Trustees are entitled to an award of fees at market rates, the district court should also make an award of fees

---

**15.** Section 1132(g)(2) does provide that "in any action under this subchapter ... in which a judgment in favor of the plan is awarded, the court shall award the plan ... (D) reasonable attorney's fees and costs of the action...." 29 U.S.C. § 1132(g)(2). The decision of this court vacating and remanding the district court's ruling on the fees issue is denominated a "judgment," *see* FED R.APP. P. 36, and could be said to be "in favor of the plan" in the sense that the

Trustees have achieved the relief that they sought from this court on the issue they appealed. But a more natural reading of "judgment" in this context limits it to the original proceeding before the district court, in view of the subsequent listing of the content of the award, which includes "the unpaid contributions," interest, and liquidated damages, in addition to "attorney's fees and costs of the action."

incurred by the Trustees in bringing their appeal of the attorney's fees issue.

We therefore vacate the district court's award of attorney's fees, and remand for proceedings consistent with this opinion.

*So ordered.*

RANDOLPH, Circuit Judge, concurring in part and dissenting in part:

I dissent from the portion of the majority opinion relating to attorney's fees. In my view, employee plans are not entitled to recover more than their actual cost of legal services.

When a plan wins its case, the court "shall award" the plan "reasonable attorney's fees and costs of the action, to be paid by the defendant," 29 U.S.C. § 1132(g)(2). It is true that language like this appears in 42 U.S.C. § 1988 (and countless other fee-shifting statutes); that *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), interpreted § 1988 to mean that a "reasonable" fee should be calculated by using the market hourly rate rather than the rate actually charged; and that *Independent Federation of Flight Attendants v. Zipes*, 491 U.S. 754, 758 n. 2, 109 S.Ct. 2732, 2735 n. 2, 105 L.Ed.2d 639 (1989), said that similarities in the language of fee-shifting statutes are a "strong" indicator of similarities in meaning. But *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), "squelched"—to use the Seventh Circuit's word—"[a]ny tendency to treat all attorneys' fees statutes as if they were insignificant variations on § 1988." *Stomper v. Amalgamated Transit Union, Local 241*, 27 F.3d 316, 318 (7th Cir.1994). After *Fogerty*, "[d]ifferent statutes receive individual analysis," or should. *Id.*

As to the particular statute before us, it seems to me that a cost-of-service award, in combination with the other provisions in § 1132(g)(2), fully accomplishes "Congress's preeminent purpose ... to keep ERISA plans solvent," maj. op. at 805. Victorious plans are entitled not only to reasonable attorney's fees and the amount of the delinquent contributions, but also to double interest on those contributions and to any other "legal and equitable relief ... the court deems appropriate." 29 U.S.C. § 1132(g)(2)(A)–(E). In the face of provisions furnishing ample deterrence for delinquent employers and ample compensation to victorious plans, I see no good reason why a plan should also be awarded more than its lawyers charged it. The majority thinks that unless market-based fees are awarded, plans will be unable to hire "competent counsel." Maj. op. at 804. This strikes me as doubly mistaken. For one thing it assumes that expensive counsel necessarily equals competent counsel, an equation not borne out by my experience. For another thing it contemplates only one kind of fee arrangement—one requiring the client to turn over the excess to its lawyer. We apparently have that arrangement in this case. But in other cases the retainer agreement may be such that the plan, rather than its below-market-rate lawyer, keeps the windfall. I have no way of knowing which is the more common fee agreement in these sorts of cases and neither do the other judges on this court.

My colleagues charge the district court with the duty of deciding whether the lawyers in this case gave the plan a discount for "public-spirited reasons." This sounds like a rule saying that market rates will be awarded only if the lawyers never expected to receive market rates. A lawyer cannot be acting out of public spirit in a case, I suppose, if he hopes or expects to collect the full going rate. At least that is the theory. Yet once the majority's rule goes into place, every reasonable lawyer representing an employee benefit plan against an employer—reasonable because the lawyer has read my colleagues' opinion—will hope to recover fees at the market rate. And that is scarcely the only difficulty. Consider the conundrum posed by lawyers who had mixed motives for taking the case at less than the market rate. Suppose, for instance, the law firm thought that by representing the plan at a discount, it was doing some public good; that besides, the case would help fill in some gaps on the firm's timesheets; that the case would be a useful training ground for a young associate or two; that taking the case might lead to, or help retain, full-fee paying clients; and that if the firm won, it would wind up getting the

**810**

going rate anyway. I suspect that such a range of motives would typically be uncovered if one probed deeply enough. Then no one would be able to say where "public spiritedness" ended and self interest began, or what imaginary scale determines which outweighs the other. This only reinforces my belief that § 1132(g)(2)—correctly interpreted—permits victorious plans to be reimbursed for no more than their cost of legal services. But as between a rule awarding market rates only when the below-market lawyer satisfies the majority's motivational criterion, and a rule awarding market rates in every case, the latter is clearly the lesser evil, if for no other reason than it is better to clear up a mess than to create one.